1    **WO**

2

3

4

5

6

7              **IN THE UNITED STATES DISTRICT COURT**

8                **FOR THE DISTRICT OF ARIZONA**

9
     Richard Dean Hurles,              )      No. CV-00-0118-PHX-RCB
10                                      )
                          Petitioner,   )      <u>DEATH PENALTY CASE</u>
11                                      )
                    v.                  )
12                                      )
     Dora B. Schriro, et al.,           )      **MEMORANDUM OF DECISION**
13                                      )      **AND ORDER**
                                        )
14                    Respondents.      )
                                        )
15   _____   )

16          Richard Dean Hurles (Petitioner) has filed an Amended Petition for Writ of Habeas

17   Corpus pursuant to 28 U.S.C. § 2254 alleging that he is imprisoned and sentenced to death

18   in violation of the United States Constitution.  (Dkt. 25.)[1]  In this order, the Court reviews

19   _____

20          [1]      "Dkt." refers to documents filed in this Court.  "RT" refers to the reporter's
     transcript.  "SA" refers to documents filed in Petitioner's Special Action Proceeding before
21   the Arizona Court of Appeals (Case No. CV-93-0134-SA).  "ROA I" refers to documents in
     the Record on Appeal prepared by the Maricopa County Superior Court for Petitioner's direct
22   appeal to the Arizona Supreme Court (Case No. CR-94-0366-AP).  "ROA II" refers to
     documents in the Record on Appeal prepared by the Maricopa County Superior Court for
23   Petitioner's petition for review to the Arizona Supreme Court from the denial of relief in
     Petitioner's first PCR proceeding (Case No. CR-99-0422-PC).  Copies of these records as
24   well as the original trial transcripts and appellate briefs were provided to this Court by the
     Arizona Supreme Court on August 24, 2000.  "Dkt. 72" consists of separately indexed and
25   paginated post-conviction relief (PCR) documents, minute entries (ME), and petition for
     review (PR) documents from Petitioner's second PCR proceeding (Case No. CR-05-0118-
26   PC).
27

the merits of Petitioner's properly exhausted claims and his requests for further evidentiary development and a hearing.

## BACKGROUND

The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest and conviction as follows:

> After serving nearly fifteen years in prison for sexually assaulting two young boys, Richard Dean Hurles was released on parole in June 1992. Following his release, Hurles moved to Buckeye, where some of his family lived.
>
> On the afternoon of November 12, 1992, Hurles went to the Buckeye public library, a small, house-type building in a residential neighborhood. The only employee in the library at the time was Kay Blanton. The last patron, other than Hurles, left the library just before 2:40 p.m. Hurles then locked the front doors to the library and attacked Blanton in the back room. He stripped off her underwear and pulled her skirt above her waist in an unsuccessful attempt to rape her. Using a paring knife found in the back room of the library, Hurles mortally wounded Blanton, stabbing her thirty-seven times and inflicting blunt force trauma by kicking her to such an extent he tore her liver.
>
> At approximately 2:45 p.m., Mark Porter and his friend, John Kale, went to the library and discovered the front doors were locked. Porter looked through the window and saw Blanton lying in a pool of blood. While Porter went around to the back door of the library, Kale ran across the street to a house were Dale Capper was working on his truck. Capper had noticed Porter and Kale try to open the library door and had, at the same time, seen Hurles "crash" through the back door of the library, run toward him, and then head down the street. After Kale explained what he and Porter had seen, Capper got into his truck and followed Hurles. Meanwhile, Porter entered the library through the open back door and called 911. The call to 911 was received at 2:50 p.m.
>
> Capper followed Hurles down the street and caught up to him at a four-way stop. While he was stopped, Capper had an excellent opportunity to identify Hurles when the latter approached the truck and asked Capper "How are you doing?," to which Capper responded "I'm doing okay." Capper then observed Hurles enter an apartment complex, at which point Capper left his truck and continued following Hurles.
>
> At the apartment complex, Capper saw Hurles talking to Robert Phillips, who knew Hurles. Phillips was outside fixing a lawnmower when Hurles approached and asked to borrow the bicycle laying next to him. Phillips initially refused to let Hurles take the bike but relented after Hurles asked him ten to twenty times. At approximately 3:00 p.m., Capper watched Hurles ride away on the bicycle; he then returned to the library to tell police what he had seen.
>
> Between 3:00 and 4:00 p.m., Hurles rode the bicycle to the home of his

nephew, Thomas, in Buckeye and asked Thomas for a ride to Phoenix. Hurles had changed his clothes and cleaned himself up somewhat, and Thomas, who had been asleep and was unaware of Blanton's murder, agreed to drive Hurles to Phoenix. As the two left the house, Hurles was carrying a bundle of clothes. During the drive to Phoenix, Thomas noticed that Hurles had bite marks on his wrist. When asked about them, Hurles told Thomas he had been in a fight with a Spanish man at the library, that he had stabbed the man with the man's knife, and that he had received the bite marks in the fight. As part of his insanity defense, however, Hurles later claimed he had no recollection of anything that occurred between sitting in the library and going out the back door.

As they continued toward Phoenix, Hurles had Thomas pull over so he could toss the bundle of clothes out the car window. Hurles left Hurles at a Phoenix bus station, where he purchased a bus ticket to Las Vegas. Thomas returned to Buckeye, where he ultimately made contact with the police and told them of Hurles' destination. Later that evening, the police intercepted Hurles' bus on the way to Las Vegas; Hurles was removed from the bus, arrested, and returned to Phoenix.

With Thomas' help, the police recovered Hurles' discarded clothes. Police found blood on the clothing that matched Blanton's blood type, which occurs in one percent of the population. Police also found blood matching Blanton's type on Hurles' shoes, which he was still wearing when taken from the bus. Four bloody shoeprints at the murder scene matched the soles of Hurles' shoes, and Hurles' palm print was found on the paring knife left at the scene.

On April 15, 1994, all twelve jurors found Hurles guilty of both premeditated and felony murder. The trial court sentenced Hurles to death and this appeal followed.

*State v. Hurles*, 185 Ariz. 199, 201-02, 914 P.2d 1291, 1293-94 (1996) ("*Hurles II*").

Following his unsuccessful direct appeal, Petitioner filed a petition for post-conviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. (Dkt. 27, Ex. D.) The trial court concluded that Petitioner's claims lacked merit. (*Id*., Ex. J.) Petitioner then filed a petition for review, which was summarily denied by the Arizona Supreme Court.

Thereafter, Petitioner commenced these habeas proceedings and in September 2000 filed an amended habeas petition raising ten claims. (Dkt. 1, 25, 26.) In December 2000, Respondents filed an answer, limited by the Court's case management order to issues of exhaustion and procedural default. In January 2001, unbeknownst to the Court, Petitioner returned to state court and filed a second PCR petition raising claims from his amended habeas petition that had not been previously presented in state court, including an allegation

1    based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that he was entitled to a jury trial on

2    aggravating factors.  (Dkt. 72, PCR at 1, 136.)  In March 2001, Petitioner alerted the Court

3    to his pending state proceedings and requested permission to withdraw "unexhausted" habeas

4    claims and to hold his habeas petition in abeyance.  The Court denied the motion without

5    prejudice based on pending review of the Ninth Circuit's decision in *Smith v. Stewart*, 241

6    F.3d 1191 (9th Cir. 2001), *rev'd*, 536 U.S. 856 (2002), which had called into question the

7    independence of Arizona's rule of preclusion for claims not previously raised during trial,

8    on appeal, or in a previous PCR proceeding.  (Dkt. 50.)

9          In November 2001, following the Supreme Court's grant of certiorari in *Atkins v.*

10   *Virginia*, Petitioner added to his second PCR petition an assertion that his mental retardation

11   precluded imposition of the death sentence.  (Dkt. 72, PCR at 368-86.)  In the fall of 2002,

12   the state PCR court ordered additional briefing on Petitioner's *Apprendi* claim in light of the

13   Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), determined that Petitioner

14   was entitled to discovery and an evidentiary hearing on his *Atkins* claim, and summarily

15   dismissed the remaining claims as procedurally precluded.  (Dkt. 72, ME at 11-16, 22, 25.)

16   After investigation but prior to the beginning of the hearing, Petitioner withdrew his *Atkins*

17   claim, and the Court denied the *Apprendi* claim based on the Supreme Court's determination

18   in *Schriro v. Summerlin*, 542 U.S. 348 (2004), that *Ring* does not apply retroactively.  (*Id.*

19   at 52.)  Petitioner sought review in the Arizona Supreme Court, which denied the petition

20   without comment.  (Dkt. 72, PR at 400.)

21         In July 2006, the Court issued an order on the procedural status of Petitioner's habeas

22   claims, dismissing Claims 1, 3, 4, 5, 6 (in part), 7 (in part), 8, and 9 as procedurally barred

23   or plainly meritless.  (Dkt. 73.)  The Court ordered the parties to brief the merits of Claims

24   2 and 10, as well as parts of Claims 6 and 7.  (*Id.* at 18.)  Petitioner filed a Motion to

25   Reconsider, which the Court denied.  (Dkts. 74, 84.)  Briefing on the merits of Petitioner's

26   remaining claims was completed in April 2007.  (Dkts. 85, 90, 95.)

27

**DISCUSSION**

**I.      AEDPA Standard for Habeas Relief**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S.Ct. 649 (2006): *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381.  Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether

1   a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

2        The Supreme Court has provided guidance in applying each prong of § 2254 (d)(1).

3   The  Court has explained that a state court decision is "contrary to" the Supreme Court's

4   clearly established precedents if the decision applies a rule that contradicts the governing law

5   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

6   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

7   indistinguishable from a decision of the Supreme Court but reaches a different result.

8   *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In

9   characterizing the claims subject to analysis under the "contrary to" prong, the Court has

10   observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

11   facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

12   clause."  *Williams*, 529 U.S. at 406; *Lambert*, 393 F.3d at 974.

13        Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

14   may grant relief where a state court "identifies the correct governing legal rule from [the

15   Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

16   "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

17   where it should not apply or unreasonably refuses to extend that principle to a new context

18   where it should apply."  *Williams*, 529 U.S. at 407.  In order for a federal court to find a state

19   court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the

20   petitioner must show that the state court's decision was not merely incorrect or erroneous,

21   but "objectively unreasonable."  *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per

22   curiam).

23        Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

24   court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

25   *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

26   determination will not be overturned on factual grounds unless objectively unreasonable in

27   light of the evidence presented in the state-court proceeding."  *Miller-El v. Cockrell*, 537

U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddux*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1): *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853. Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## II.    Evidentiary Development Standard

With respect to Claims 2 (judicial bias) and 7 (ineffective assistance of counsel at sentencing) Petitioner has requested a hearing and leave to conduct additional discovery. (*See* Dkt. 85 at 27-44, 59.) The Court will address Petitioner's requests for evidentiary development in conjunction with its discussion of those respective claims. In doing so, the Court applies the relevant provisions of 28 U.S.C. § 2254(e)(2):

1   If the applicant has failed to develop the factual basis of a claim in State court
2   proceedings, the court shall not hold an evidentiary hearing on the claim unless
    the applicant shows that –

3   (A) the claim relies on –

4       (I) a new rule of constitutional law, made retroactive to cases on collateral
        review by the Supreme Court, that was previously unavailable; or
5
6       (ii) a factual predicate that could not have been previously discovered
        through the exercise of due diligence; and

7   (B) the facts underlying the claim would be sufficient to establish by clear and
    convincing evidence that but for constitutional error, no reasonable factfinder
8   would have found the applicant guilty of the underlying offense.

9       Section 2254(e)(2) similarly limits a petitioner's ability to present new evidence

10  through a motion to expand the record pursuant to Rule 7 of the Rules Governing Section

11  2254 Cases.[2] *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding

12  that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new

13  evidence, even when they do not seek an evidentiary hearing) (citing *Holland v. Jackson*, 542

14  U.S. 649, 652-53 (2004) (per curiam)).

15      The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary

16  hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of

17  diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

18  *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  A hearing is not barred, however, when a

19  petitioner diligently attempts to develop the factual basis of a claim in state court and is

20  "thwarted, for example, by the conduct of another or by happenstance was denied the

21  opportunity to do so."  *Id.*; *see Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999)

22  (allowing hearing when state court denied opportunity to develop factual basis of claim).

23

---

24      [2]     Rule 7 authorizes a federal habeas court to expand the record to include
25  additional material relevant to the determination of the merits of a petitioner's claims.  "The
    materials that may be required include letters predating the filing of the petition, documents,
26  exhibits, and answers under oath, to written interrogatories propounded by the judge.
27  Affidavits may also be submitted and considered as part of the record."  Rule 7(b), Rules
    Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court. *See id*. at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002). Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir. 2001). The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (counsel failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005).

Pursuant to *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254 (e)(2), a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *See also Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228, 1233-34 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations); *see also Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007) ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an

1  evidentiary hearing is appropriate.").  Thus, Petitioner is entitled to an evidentiary hearing

2  on a claim only if he alleges "facts that, if proven, would entitle him to relief." *Turner v.*

3  *Calderon,* 281 F.3d 851, 890 (9th Cir. 2002) ("[e]ntitlement to an evidentiary hearing based

4  on alleged ineffective assistance, for example, requires a showing that if his allegations were

5  proven at the evidentiary hearing, deficient performance and prejudice would be

6  established")  (quoting *Tapia v. Roe,* 189 F.3d 1052, 1056 (9th Cir.1999)).

7        Concerning requests for discovery, Rule 6(a) of the Rules Governing Section 2254

8  Cases provides that "[a] judge may, for *good cause,* authorize a party to conduct discovery

9  under the Federal Rules of Civil Procedure, and may limit the extent of the discovery."  Rule

10 6(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (emphasis added).  Thus, unlike

11 the usual civil litigant in federal court, a habeas petitioner is not entitled to discovery "as a

12 matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Campbell*

13 *v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993).  Nor should the courts allow him to "use

14 federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. United*

15 *States Dist. Ct. For the N. Dist. Of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see*

16 *also Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas corpus is not intended

17 to be used as a fishing expedition for petitioners to "explore their case in search of its

18 existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).   To

19 determine whether a petitioner has established "good cause" for discovery under Rule 6(a),

20 a habeas court must identify the essential elements of the petitioner's substantive claim and

21 evaluate whether "specific allegations before the court show reason to believe that the

22 petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled

23 to relief."  *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

24 **III.   Judicial Bias**

25        In Claim 2, Petitioner asserts that his right to due process was violated when the trial

26 judge failed to recuse herself after creating an appearance of impartiality by becoming a party

27

1   to an appellate interlocutory action sought by Petitioner prior to trial.[3]  (Dkt. 26 at 36-37; Dkt.

2   85 at 8.)

3       **A.   Background**

4           The following background facts are not in dispute.  Prior to trial, Petitioner moved for

5   appointment of a second attorney to assist in his defense.  (SA at 30-34.)  The trial judge,

6   Maricopa County Superior Court Judge Ruth Hilliard, summarily denied the motion.  (*Id.* at

7   36.)  Petitioner sought interlocutory relief in the Arizona Court of Appeals vis-a-vis a petition

8   for special action, challenging the trial court's denial and asserting that defendants in capital

9   cases are entitled to two lawyers.  *See Hurles v. Superior Court in and for the County of*

10  *Maricopa*, 174 Ariz. 331, 849 P.2d 1 (Ariz. Ct. App. 1993)  ("*Hurles I*").  The Maricopa

11  County Attorney's office, who was prosecuting, declined to respond to the special action

12  because under state law it lacked standing in the selection of defense counsel.  *Id.* at 332, 849

13  P.2d at 2.  At the behest of the Presiding Judge of the Maricopa County Superior Court, the

14  Arizona Attorney General filed a response on behalf of the trial judge.[4]  *Id.*

15          In a published decision, the Arizona Court of Appeals first addressed whether Judge

16

17          [3]     To the extent Claim 2 includes an allegation concerning Judge Hilliard's failure
18  to recuse herself during state post-conviction proceedings, the Court finds it is not cognizable
    on federal habeas review.  *See Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir. 2004)
19  (holding that a constitutional claim predicated on a state judge's failure to recuse in a state
    post-conviction proceeding is not appropriate on federal habeas review because "while
20  habeas relief is available to address defects in a criminal defendant's conviction and
    sentence, an alleged defect in a collateral proceeding does not state a basis for habeas
21  relief"); *see also Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989) ("We . . . affirm the
    district court's holding that a petition alleging errors in the state post-conviction review
22  process is not addressable through habeas corpus proceedings.").
23

24          [4]     The brief prepared by the Arizona Attorney General argued that the judge's
25  decision to deny Petitioner's request for appointment of co-counsel was justified under the
    law.  Specifically, the brief stated that the case "was relatively simple, and will not involve
26  an inordinate amount of witness testimony, and Appointed Counsel has not shown that the
    preparation and presentation will be unduly burdensome for one attorney."  (Dkt. 27, Ex. B
27  at 8.)  The Attorney General also filed a "Supplemental Memorandum."  (SA at 76-81.)

Hilliard had standing to respond to the petition. The court acknowledged that Arizona's rules governing special actions requires the trial court to be named as a nominal respondent. *Id.* It went on to hold, however, that a responsive pleading from a trial judge may be filed only if the purpose is to explain or defend an administrative practice, policy, or local rule, not simply to advocate the correctness of the judge's individual ruling. *Id.* at 333, 849 P.2d at 3. Because in this case the response filed by the Arizona Attorney General on behalf of Judge Hilliard fell into the inappropriate "I-ruled-correctly" category, the appellate court declined to consider the pleading. *Id.* at 334, 849 P.2d at 4. With regard to the merits of Petitioner's special action, the court declined to accept jurisdiction, concluding it was premature in light of Petitioner's failure to make a particularized showing on the need for second counsel in his case. *Id.*

Judge Hilliard continued to preside in the case through trial, sentencing, and the first PCR proceeding. In addition, the Assistant Arizona Attorney General who participated in the special action proceedings represented the State in opposing Petitioner's first PCR petition.[5] (*See* Dkt. 27, Ex. I.)

Subsequently, in his second PCR petition, Petitioner raised a claim alleging that his Fourteenth Amendment rights had been violated when Judge Hilliard failed to recuse herself from his case after becoming a party in the special action proceedings. (Dkt. 72, PCR at 24-45, 163-72.) Petitioner also filed an accompanying Motion to Recuse Judge Hilliard. (*Id.* at 129-44.) Judge Hilliard referred the matter to the Presiding Judge who, in turn, appointed Judge Eddward Ballinger, Jr., to rule on the motion. (Dkt. 72, ME at 1-2.) Judge Ballinger treated the motion as "a Motion for Change of Judge for Cause" and denied it, stating that

---

[5]    Assistant Arizona Attorney General Colleen French also appeared for Respondents in the initial stages of this habeas action, including authoring the response to Petitioner's Motion to Disqualify the Attorney General from participating in the habeas proceeding. (*See* Dkt. 27.) On November 21, 2000, the Attorney General filed a "Motion to Clarify Counsel," stating that Ms. French had left its employ and that James Beene was sole counsel of record for Respondents. (*See* Dkt. 34; *see also* Dkt. 39 at 4.) The Court denied the disqualification motion on January 5, 2001. (Dkt. 39.)

"[w]ith respect to the objective evaluation of the judge's actions in this matter, the Court

finds no basis to transfer this case." (*Id.*, ME at 3.)

Judge Hilliard ultimately denied relief on Petitioner's second PCR petition. With

respect to his judicial bias claim, the court ruled:

> Defendant argues in claim 2 that this Judge should have recused
> herself from consideration of the first Petition for Post-Conviction Relief based on the
> Court of Appeals' ruling in *Hurles v. Superior Court*, 174 Ariz. 331, 849 P.2d
> 1 (App. 1993).[6]  Defendant argues that because the Court of Appeals
> determined that the response filed on behalf of this judge, (without her input)
> was wrong, this judge is thereby precluded from hearing any further matters
> in this case.  However, Rule 81 of the Arizona Rules of the Supreme Court,
> Canon 3(E)(1) provides that "A judge shall disqualify himself or herself in a
> proceeding in which the judge's impartiality might reasonably be questioned
> . . . ."  The test is an objective one:  whether a reasonable and objective person
> knowing all the facts would harbor doubts concerning the judge's impartiality.
>  *State ex rel Corbin v. Superior Court*, 155 Ariz. 560, 748 P.2d 1184 (1987);
> *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S. Ct. 2194,
> 100 L.Ed.2d 855 (1988).
>
> The trial judge is presumed to be impartial and the party who seeks
> recusal must prove the grounds for disqualification by a preponderance of the
> evidence.  *State v. Carver*, 160 Ariz. 167, 771 P.2d 1382 (1989); *State v.
> Salazar*, 182 Ariz. 604, 898 P.2d 982 (App. 1995).  The facts here do not
> support disqualification and another judge, Judge Ballinger, so determined.
> In the special action in this case, the Attorney General filed a response on this
> judge's behalf but without any specific authorization of such a pleading.  No
> contact was made by this judge with the Attorney General and this judge was
> a nominal party only.  The special action was resolved five years before the
> first PCR was filed.  Based on the circumstances of this case, the Court finds
> that a reasonable and objective person would not find partiality.
>
> As in *Carver*, Hurles simply alleges bias and prejudice but offers no
> factual evidence to support his allegations.  There is no allegation of partiality
> during the trial or that rulings or conduct during the first PCR demonstrated
> any bias.  "Appearance of interest or prejudice is more than the speculation
> suggested by the defendant.  It occurs when the judge abandons the judicial
> role and acts in favor of one party or another."  Hurles has failed to overcome
> the presumption of impartiality.

(Dkt. 72, ME at 17-18.)  The PCR court further held that, even if it was error not to recuse

herself, such error was harmless in light of the overwhelming evidence of Petitioner's guilt

---

[6]     Although Judge Hilliard framed this issue as whether, under the circumstances,
she should have recused herself from the first PCR proceeding, review of Petitioner's second
PCR petition clearly indicates he also challenged the propriety of her presiding at his trial and
sentencing.  (*See* Dkt. 72, PCR at 24-45, 163-72.)

and the absence of any risk that injustice would occur in other cases or that public confidence in the judicial process would be undermined.  (*Id.* at 19.)  The Arizona Supreme Court summarily denied review without comment.

### B.   Clearly Established Supreme Court Law

The due process inquiry this Court must conduct is wholly separate from the question of whether Petitioner was entitled to a change of judge under Arizona law.  *See Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) (noting that most issues of judicial qualification are matters of legislative discretion and are not of a constitutional nature); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (same, and further noting that state statutes permitting disqualification for bias do not impose a constitutional requirement under the Due Process clause).  The PCR court denied Petitioner's claim primarily on the basis of state law; nonetheless, this Court must determine whether the state court's denial was contrary to or an unreasonable application of clearly established Supreme Court law or was based on an unreasonable application of the facts.  28 U.S.C. § 2254(d).

A defendant is entitled to a fair trial, free from judicial bias.  *In re Murchison*, 349 U.S. 133, 136 (1955).  There is a presumption that judges are unbiased, honest, and have integrity.  *See Schweicker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  Similarly, there is a presumption that judicial officials have "properly discharged their official duties."  *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  On federal habeas review, the Court "must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez,* 67 F.3d 734, 740 (9th Cir. 1995). "To sustain a claim of this kind, there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Id.* (quoting *United States v. DeLuca,* 692 F.2d 1277, 1282 (9th Cir. 1982)).

A petitioner may show judicial bias in one of two ways, by demonstrating the judge's

actual bias or by showing that the judge had an incentive to be biased sufficiently strong to overcome the presumption of judicial integrity (i.e., a substantial likelihood of bias). *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994); *Fero v. Kerby*, 39 F.3d 1462, 1478-79 (10th Cir. 1994). "Supreme Court precedent reveals only three circumstances in which an appearance of bias – as opposed to evidence of actual bias – necessitates recusal." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (citing *Winthrow v. Larkin*, 421 U.S. 35, 47 (1975)). These are (1) when the judge has a direct, substantial pecuniary interest in the outcome of the case; (2) when the judge becomes embroiled in a running, bitter controversy with one of the litigants; and (3) when the judge acts as part of the accusatory process. *Id.* (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971); and *In re Murchison*, 349 U.S. at 137). In addition, in *Mississippi v. Johnson*, 403 U.S. 212, 215-16 (1971), the U.S. Supreme Court held that due process of law requires a judge to recuse himself when "it is plain that he was so enmeshed in matters involving the petitioner as to make it appropriate for another judge to sit."

The U.S. Supreme Court has stated that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy*, 520 U.S. at 904. Thus, "these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Id.*

## C.   Analysis

Petitioner neither alleges nor cites to any part of the trial or sentencing record evidencing actual bias by Judge Hilliard; rather, his claim is limited to the appearance of bias stemming from Judge Hilliard's role as a responsive party in the special action. Likewise, the facts do not support, and Petitioner does not allege, an appearance of bias based on two of the three factors outlined in *Crater* – either bias flowing from the judge having a substantial pecuniary interest in the outcome of the case or bias because the judge was part of the accusatory process. *See Crater*, 491 F.3d at 1131. Rather, a close reading of

Petitioner's Merits Brief indicates that the claim is predicated solely on an appearance of bias akin to the second situation outlined in *Crater*; namely, that due process required Judge Hilliard to recuse herself because she became "embroiled in a running, bitter controversy" or became personally "enmeshed" in litigation with Petitioner. (Dkt. 85 at 8-13, 17, 26). *Johnson*, 403 U.S. at 215-16.

In some instances where the judge becomes embroiled or enmeshed in controversy with a defendant, due process requires recusal.  For instance, in *Johnson*, a state judge presiding in a criminal trial was named as a defendant in a federal civil rights suit filed by the defendant for systematically excluding blacks and women from juries.  In fact, as recounted by the Supreme Court, the trial judge was a "losing party" in the civil rights action and was temporarily enjoined by a federal court "from discrimination 'by reason of race, color, or sex' in jury selections."  403 U.S. at 214-15.  Just two days after the temporary injunction was issued, the same state trial judge found the defendant in criminal contempt of court and sentenced him to four months in jail and set bail at $2,000 pending appeal.  *See id.* at 214.  The Supreme Court concluded that under these circumstances due process required that the judge recuse himself because "it is plain that he was so enmeshed in matters involving petitioner as to make it most appropriate for another judge to sit."  *Id.* at 215-16.

In *Mayberry v. Pennsylvania*, a criminal defendant acting *pro se* engaged in "highly personal aspersions [toward the trial judge], even 'fighting words,'" which led the judge to hold him in criminal contempt.  400 U.S. at 455.  The Supreme Court concluded that the defendant's "insolence" toward the trial judge ignited such a "running, bitter controversy" that "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication."  *Id.* at 465.  Under such circumstances, the court determined that due process required that the defendant "be given a public trial [on the criminal contempt charges] before a judge other than the one reviled by the contemnor."  *Id.* at 466.

Nothing like the situations in *Johnson* or *Mayberry* are present here.  Judge Hilliard was named as a "nominal" party per the state rules for special actions.  *See Hurles I*, 174

Ariz. at 332, 849 P.2d at 2 (citing Rule 2(a), Rules of Procedure for Special Actions). Although the Attorney General filed a brief on the judge's behalf opposing relief, nothing in the record indicates the judge was personally involved in the proceedings or in the preparation of that brief.  In fact, Judge Hilliard stated that she did not authorize the special action brief filed by the Arizona Attorney General's office (Dkt. 72, ME at 18), and Assistant Arizona Attorney General Colleen French stated during oral argument before the Arizona Court of Appeals that there was no contact between her office and the judge in the preparation of the brief.  *Hurles I*, 174 Ariz. at 332, 849 P.2d at 2 n.2.

    Pursuant to 28 U.S.C. § 2254(e)(1), state court findings of fact are presumed to be correct and Petitioner must rebut such findings with clear and convincing evidence.  Here, Judge Hilliard specifically stated in her order that the actions by the Attorney General in response to the special action petition were made without her input and that "[n]o contact was made by [her] with the Attorney General" and she was a "nominal party only." (*See* Dkt. 72, ME 8/13/02 at 2.)  Likewise, the Arizona Court of Appeals, in its decision, accepted and recounted the statement of Assistant Attorney General French at oral argument that "the [Attorney General's] pleading was requested by the presiding criminal judge not by Judge Hilliard, and there was no contact between Judge Hilliard and the Attorney General's office as the pleading was prepared."  *Hurles I*, 174 Ariz. at 332, 849 P.2d at 2 n.2.  Petitioner does not specifically allege that these findings are erroneous, let alone rebut the presumption of correctness with clear and convincing evidence.

    To support his "enmeshment" argument, Petitioner cites excerpts from the special action responsive brief prepared by the Arizona Attorney General, which he attributes to Judge Hilliard and which he contends evince a tone "utterly inconsistent with her impartial decision-making role." (Dkt. 85 at 9.)  In particular, he cites language in the brief describing the underlying offense perpetrated by Petitioner as "brutal."  (*Id.*)  He also cites language in the brief characterizing the State's case as "very simple and straightforward, compared to other capital cases."  (*Id.* at 9-10.)  He further notes that the brief "demonstrat[ed] a

remarkable familiarity with the State's evidence before any hearings were held." (*Id*. at 10 n.5.) The Court is not persuaded that the judge's nominal role in the special action creates an appearance of impropriety.

First, nothing in the record contradicts the assurances of Judge Hilliard and Assistant Arizona Attorney General French that the judge played no role in the preparation and filing of the special action brief. Petitioner has cited no evidence to contradict their statements regarding the judge's role, or lack thereof, in preparation of the brief. Nor is there any evidence to refute the conclusion that the positions raised in the brief were anything other than the positions of the Arizona Attorney General. Petitioner's attempt to attribute language in the brief to Judge Hilliard (and from which he asserts bias on the judge's part) is not justified by the facts.

Petitioner asserts that Judge Hilliard's denial of his bias claim, predicated on her finding that she played no active role in the special action proceeding, was based on an unreasonable determination of the facts because she "relied on her untested personal recollection of the underlying events" which "are not supported anywhere in the record." (Dkt. 85 at 14.) In his reply brief, Petitioner attempts to raise doubts about the statements of Judge Hilliard and French concerning the judge's participation in the special action. (*See* Dkt. 95 at 18 & n.7.) Petitioner cites a passage from Respondents' Response to Petitioner's Motion to Disqualify the Attorney General, which was filed in this Court (*see supra* note 5), wherein French stated that she had "communications with the Trial Judge during the special action proceedings." (Dkt. 27 at 6.) Petitioner argues this statement contradicts assurances made by French before the Arizona Court of Appeals concerning Judge Hilliard's involvement in those proceedings. The Court disagrees.

Judge Hilliard has not denied having any communication with the Arizona Attorney General during the course of the special action. Rather, she stated simply that the Attorney General had filed a response on her behalf without her "specific authorization" and that "[n]o contact was *made by this judge* with the Attorney General and this judge was a nominal party

only." (Dkt. 72, ME at 18 (emphasis added).)  Moreover, in its decision declining special action jurisdiction, the Arizona Court of Appeals stated only that the Attorney General had represented at oral argument that the brief filed by that office was done at the request of the presiding criminal judge and that there was "no contact between Judge Hilliard and the Attorney General's office as the pleading was prepared." *Hurles I*, 174 Ariz. at 332, 849 P.2d at 2 n.2.  These statements do not assert that Judge Hilliard had no communication of any kind with the Arizona Attorney General at any point during the special action proceedings and are thus not inconsistent with the statement made by Ms. French in response to Petitioner's Motion to Disqualify.

In recounting that she played no active role in the special action, Judge Hilliard was merely responding to Petitioner's allegation of bias, a claim he brought squarely before her in his second PCR petition.  Judge Hilliard was uniquely positioned to know her role in the special action.  More importantly, as already noted, additional facts corroborate her statement that she played no active role in that proceeding.  Years before this issue was raised in the second PCR, Attorney General French told the Arizona Court of Appeals that the pleading filed by the Attorney General's office in the special action was not requested by Judge Hilliard and that there was no contact between her office and Judge Hilliard "as the pleading was prepared."  For these reasons, Petitioner's contention that Judge Hilliard's recollection was untested and not supported in the record is without merit.

Second, even if statements in the brief are attributable to Judge Hilliard, they do not evince bias.  To describe the crime as brutal is self-evident from the facts and does not indicate a pronouncement of guilt.  Likewise, the statement that the case was "simple and straightforward" does not evidence bias; rather, it is merely a statement of the basis upon which the trial court concluded that appointment of additional counsel was unwarranted. Neither these statements nor any others cited by Petitioner from the responsive brief indicate that Judge Hilliard had passed on his guilt or innocence or provide a basis to believe she could not preside over his criminal proceedings in an impartial manner.  "In the absence of

any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.'" *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Liteky v. United States,* 510 U.S. 540, 555 (1994)).  Moreover, as the Supreme Court explained in *Liteky,* "It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." 510 U.S. at 555; *cf. Withrow*, 421 U.S. at 57 (having the same judge retry a case after remand does not violate due process).

In addition, unlike the situation in either *Johnson* or *Mayberry*, there is no example of personal antagonism between Petitioner and Judge Hilliard that could be seen to compromise the judge's impartiality.  The question at issue in Petitioner's special action – whether Petitioner was entitled to appointment of a second attorney under state law – did not touch upon any substantive issues relating to Petitioner's guilt or innocence.

The facts in *Crater* are instructive.  In that case, Crater alleged the trial judge was biased because at an in-camera pretrial conference the judge told him he should accept a plea deal offered by the State.  In so recommending, the judge stated *inter alia* that "based upon what I've heard about this case, I'm real sure that you're going to be convicted of all of those robberies, that you're going to be convicted of shooting the first robbery victim." 491 F.3d at 1130.  The Ninth Circuit found no constitutional violation arising from the judge continuing to preside at trial.  The court concluded that "the judge's predictions did not suggest bias" and further noted that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make a fair judgment impossible." *Id.* at 1132 (quoting *Liteky*, 510 U.S. at 555).

Here, nothing in the Attorney General's brief, and certainly nothing directly

attributable to Judge Hilliard, betray any belief as to Petitioner's guilt or innocence akin to the remarks expressed by the trial judge in *Crater*.  Yet, the Ninth Circuit found those remarks insufficient to compromise Crater's due process rights in the absence of that judge's recusal.

Petitioner makes much of the fact that the Arizona Court of Appeals "recognized the due process issue that the respondent judge had created by appearing through the Attorney General to defend her ruling."  (Dkt. 85 at 10.)  Indeed, the court did conclude it was "improper for a judge to respond [in a special action proceeding] merely to advocate the correctness of an individual ruling in a single case." *Hurles I*, 174 Ariz. at 333, 849 P.2d at 3.  Nevertheless, as noted, there is no evidence indicating that Judge Hilliard was anything other than a "nominal" party in this case, or to presume that the brief expressed anything other than the opinion of  the Arizona Attorney General's office.  The Arizona Court of Appeals did not suggest in its order dismissing the special action that Judge Hilliard should not continue to preside over the matter or that the "inappropriate" response was grounds for recusal.  In addition, when Petitioner commenced the second PCR proceeding raising this claim for the first time, the matter was referred at Judge Hilliard's instigation to another judge to determine if she should be recused.  That independent judge, Judge Ballinger, concluded there was no basis for recusal.  (Dkt. 72, ME 3/22/01 at 3.)

Finally, at the time this action was commenced, it was not settled under Arizona law that the filing of a response in a special action by a trial judge was improper.  As noted by the *Hurles I* court, in *Fenton v. Howard*, 118 Ariz. 119, 575 P.2d 318 (1975), the Arizona Supreme Court stated that "a judge does have a right to appear and to be represented in a special action against him, where the judge is a named respondent."  174 Ariz. at 332, 849 P.2d at 2.  Following up on this, in *State ex rel. Dean v. City Court*, the court, though criticizing a judge's participation as an active litigant in a special action, nevertheless concluded that *Fenton* permitted a response by the respondent judge.  123 Ariz. 189, 190, 598 P.2d 1008, 1009 (Ariz. Ct. App. 1979).  Even in this case, the Arizona Court of Appeals

concluded it was not improper for a judge to actively participate in special action litigation under certain circumstances, such as to defend the validity of an underlying administrative practice, policy, or local rule. *Hurles I*, 174 Ariz. at 332-33, 849 P.2d at 2-3; *cf.* 16A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3967 (3d ed. 1999) (describing trend in federal courts discouraging active participation of trial judge in mandamus proceedings).

Considering the totality of the circumstances, including the nature of the dispute involved in the special action (whether Petitioner was entitled to state-appointed second counsel), the nominal role of Judge Hilliard as a respondent in the special action, and the uncontradicted statements in the record by Judge Hilliard and Assistant Arizona Attorney General French that the judge's actual participation in the special action was minimal if not nonexistent, the state PCR court's denial of relief on this claim was neither contrary to nor an unreasonable application of U.S. Supreme Court precedent. *See Jones v. Luebbers*, 359 F.3d 1005, 1012-13 (8th Cir. 2004) (noting that the standard for a constitutional due process claim based on an appearance of judicial bias is "vague" and "when viewed through the deferential lens of *Williams v. Taylor* and the AEDPA, necessarily leaves state courts considerable latitude to pronounce rulings that do not contradict, and are reasonable applications of, *Murchison* and *Tumey*. . . . This is especially true when the allegations of bias do not relate to pecuniary interests or procedural infirmities, but rather, relate to alleged personal animosity and instances of stern courtroom administration"); *see also Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (same).  In addition, for the reasons discussed, Judge Hilliard's finding that the circumstances did not support a claim of bias warranting recusal was not based on an unreasonable determination of the facts.

Because Petitioner has not alleged facts which, if proved, would entitle him to relief, his requests for evidentiary development are denied. *See Townsend*, 372 U.S. at 312-13.

**IV.    Out-of-Court Statements**

In Claim 10, Petitioner asserts that his right to due process was violated when the trial

court allowed prosecution witness Rolla Williams to testify concerning out-of-court statements made by Petitioner's brother, Dale Hurles.  (Dkt. 85 at 59.)

## A.   Background

Prior to trial, in anticipation of an insanity defense, the State filed a Motion in Limine to admit evidence pursuant to Rule 404(b) of the Arizona Rules of Evidence.[7]  (ROA I, 93.) In particular, the State sought to admit the following background and character evidence via the testimony of one of its witnesses, Rolla Williams, the live-in boyfriend of Petitioner's brother's ex-wife, including: (1) Petitioner's prior conviction for kidnaping and sexual assault of a minor; (2) that Petitioner was released from prison for that crime in June 1992 and placed on parole; (3) that following his release from prison for that crime he frequented the residence of Rolla Williams in Buckeye, Arizona, where Williams lived with his girlfriend and his girlfriend's teenage daughter, Shannon Hurles, who was Petitioner's niece; (4) that about a month prior to the murder at issue in this case, Shannon's father and Petitioner's brother, Dale Hurles, concerned about Petitioner's prior conviction and his habit of visiting his underage niece at Williams's home, asked Williams not to allow Petitioner to come to the house; (5) that Williams told Petitioner about these concerns and asked him not to come to his house to visit Shannon; and (6) that Petitioner told Williams at the time Williams asked him not to come to his house, that he (Petitioner) "was going to get sex from a woman and he didn't care how he went about getting it" and that he "would do anything he had to in order to get sex."  (*See id*. at 2.)  The State argued that because Petitioner was

---

[7]       Rule 404, Arizona Rules of Evidence, provides, in pertinent part:

**(b) Other crimes, wrongs, or acts**.  Except as provided in Rule 404(c) evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

advancing an insanity defense, the evidence outlined above was not being admitted to show bad character, but rather for "another purpose," such as to establish "identity, plan and premeditation," in order refute the insanity defense.  (*See id*. at 2-4.)

In his response to the motion, Petitioner conceded that "[e]vidence of the defendant's 'previous troubles' may be admissible to help a jury better understand the defendant's mental condition at the time of the offense."  (ROA I, 115 at 3.)  However, Petitioner argued that raising an insanity defense does not open the door to admission of such evidence if it is irrelevant.  Petitioner argued the evidence was not relevant and also argued that "the potential prejudice to the defendant far outweighs any probative value."  (*Id*. at 4.)  The trial court disagreed and ruled:

> At this time the Court finds that the 404(B) evidence is admissible at trial. The Court finds that the evidence is probative, of a material fact, and that the probativeness outweighs any potential prejudice under Rule 403, so I am going to grant the Rule 404(B) motion.
>
> The Court makes a finding that it is not admitted to prove conduct, but there are other valid reasons for the 404(B) evidence to come in, so I will grant the State's motion.

(RT 4/4/94 at 7.)

At trial, Williams testified that he met Petitioner about a month prior to the crime. Williams was living with Petitioner's brother's ex-wife, Edy Hurles, and her two teenage children (Petitioner's niece and nephew).  Petitioner was a frequent visitor.  "He came maybe every other day for about a week, then he came almost every day for about three weeks." (RT 4/6/94 at 55.)  According to Williams, Petitioner's brother Dale was "in a rage" about Petitioner's visits and in late October 1992 asked Williams to tell Petitioner to stop visiting:

> A.   Shannon Hurles' dad, named Dale Hurles, asked me to ask Richard Hurles not to come around anymore, because he was afraid that he was going to rape her or something or harm her.  And finally I decided to tell him.  It was put on me to tell him for my girlfriend and their dad.

(*Id*. at 57, 56.)  Williams subsequently told Petitioner to stay away:

> A.   I told him that – I said, "Richard, I got something to tell you.  That it's not my position to tell you, because you're part of the family, but you're – I have to tell you this because it's going to cause problems with you coming around here with Shannon and Billy.  And I wish that you wouldn't come

1  around anymore."

2      And I used –

3  Q.   Did he respond to that?

4  A.   No, he didn't respond to that.  He just listened.

5  Q.   Did there come a time when he said something in answer to that?

6  A.   No.

7  Q.   Did he say anything about not coming around anymore?

8  A.   Well, yes, he did.  He said that he served his time for his crime before,
   and he couldn't figure why he was being – I guess intimidated by now.  He
9  said, "I served my time."  Richard Hurles said that.

10 Q.   Did he say anything else?

11 A.   Not in relationship with Shannon and Billy.

12 Q.   Did he say anything else in relationship to anything else?

13 A.   Yes.

14 Q.   What did he say?

15 A.   Okay.  When I asked him what did he do in prison –

16 Q.   All right.  I am not going to get into that.

17 A.   Okay.

18 Q.   You asked him.  What did he respond?  I will ask you what he told you.

19 A.   He didn't respond to anything about Shannon and Billy not coming
   around.  He didn't say anything about them.  But later on he mentioned, tried
20 to mention [something] about Edy.

21 Q.   What did he mention about Edy?

22 A.   He made this comment that he was going to find a woman like her, but
   he didn't say whether it was Edy or Shannon.  He said, "I am going to find a
23 woman where I can have a relationship with this person, and it don't matter
   how I go about getting it.  I am going to get it one way or another."

24 Q.   Who said that to you.

25 A.   Richard Hurles said that to me.

26 (*Id.* at 58-60.)

27      On appeal to the Arizona Supreme Court, Petitioner alleged a federal due process

- 25 -

violation flowing from the trial court's admission of Williams's testimony.  (ROA I, Appellant's Brief at 9-13.)  The court disagreed:

> Hurles claims that the trial judge erred in agreeing to let Williams testify about the details of Hurles' prior convictions.  The state wanted to use those convictions as an explanation for Williams' testimony that he told Hurles not to come to the house anymore.
>
> We need not determine whether the trial judge's ruling on this matter was correct because the state did not ask, and Williams did not testify, about the prior convictions or their underlying details.  Instead, the state asked Williams to explain "the circumstances surrounding your asking [Hurles] not to come to the house.  In his response, Williams testified only that Hurles brother asked him to tell Hurles not to come around anymore because the brother feared Hurles would rape the two young children living with Williams.  These children happened to be Hurles' niece and nephew.  Because the testimony about which Hurles complains was never adduced, his arguments are without merit.

*Hurles II*, 185 Ariz. at 203-04, 914 P.2d at 1295-96.

**B.   Analysis**

Although Petitioner's argument on direct appeal alleged a due process violation stemming from Williams's testimony "about the details of Hurles' prior convictions," *id.* at 203-04, 914 P.2d at 1295-96, Petitioner now asserts that the admission of Williams's statements violated due process because they were inadmissible hearsay.[8]  Petitioner further argues in this proceeding that the statements constituted improper character evidence because they suggested to the jury that Petitioner was the sort of person who had inappropriate sexual interests and was distrusted by his own family.  (Dkt. 26 at 133.)

In general, state law matters, including a trial court's evidentiary rulings, are not proper grounds for habeas corpus relief.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal

---

[8]     As noted by the Court in its July 2006 order regarding the procedural status of Petitioner's claims, Respondents conceded exhaustion of the due process aspect of Claim 10. (Dkt. 73 at 12.)

quotation omitted); *see Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  Only if the admission of the evidence was so prejudicial as to offend due process may the federal courts consider it.

The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States*, 493 U.S. 342, 352 (1990).  Pursuant to this narrow definition, the Court has declined to hold, for example, that evidence of other crimes or bad acts is so extremely unfair that its admission violates fundamental conceptions of justice.  *Estelle*, 502 U.S. at 75 & n.5; *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967).  Thus, there is no clearly established Supreme Court precedent which holds that a state violates due process by admitting evidence of prior bad acts.  *See Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003).  In *Bugh*, the Sixth Circuit held that the state court decision allowing admission of evidence pertaining to the petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly established Supreme Court precedent because there was no such precedent holding that the state violated due process by permitting propensity evidence in the form of other bad acts evidence.  *Id.* at 512-13; *see also Alberni v. McDaniel*, 458 F.2d 860, 863 (9th Cir. 2006) (no clearly established federal law forbidding the use of propensity evidence as violative of due process, citing *Estelle v. McGuire*, 502 U.S. at  75 n.5).

Moreover, even assuming the trial court erred in admitting Williams's testimony, the error is harmless.  *See Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (holding that "trial errors" such as those involving the erroneous admission of evidence are subject to harmless error review).  First, Petitioner himself brought out through the direct examination of his mental health expert, Dr. Marc Walter, the fact that Petitioner had previously committed sex crimes against young boys.  (*See* RT 4/12/94 at 38, 87.)  Second, the State introduced overwhelming evidence of guilt.  One witness testified seeing Petitioner "crash out" the rear of the library contemporaneous to the murder.  (RT 4/5/94 at 26.)  Another witness testified that Petitioner was alone with Kay Blanton just prior to the discovery of the crime.  (RT

4/6/94 at 6.)  Petitioner's palm prints were found on the murder weapon.  (RT 4/11/94 at 59.)

Petitioner was apprehended while attempting to flee town, and blood matching the victim's

type was found on the clothing and shoes he was wearing at the time of the crime.  (RT

4/6/94 at 63-65; RT 4/11/94 at 75-90.)  Bloody shoe prints at the murder scene matched the

size, shape, and sole of Petitioner's shoes.  (*See* RT 4/11/94 at 29-31.)  In addition, Petitioner

did not deny killing Blanton, arguing instead that he was insane.  Thus, the trial court's

admission of Williams's statements, even if erroneous, did not have a substantial and

injurious effect on the verdict.  The Arizona Supreme Court's denial of this claim was neither

contrary to nor an unreasonable application of Supreme Court law.

## V.    Ineffective Assistance of Counsel on Appeal

The Fourteenth Amendment guarantees a criminal defendant the right to effective

assistance of counsel on his first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  A

claim of ineffective assistance of appellate counsel is reviewed according to the standard in

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  *See Miller v. Keeney*, 882 F.2d

1428, 1433-34 (9th Cir. 1989).  Under *Strickland*, a petitioner must show that counsel's

appellate advocacy fell below an objective standard of reasonableness, and that there is a

reasonable probability that, but for counsel's deficient performance, the petitioner would

have prevailed on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see Miller*, 882

F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

"A failure to raise untenable issues on appeal does not fall below the *Strickland*

standard."  *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002); *see also Wildman v.*

*Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel could not be found to have

rendered ineffective assistance for failing to raise issues that "are without merit"); *Boag v.*

*Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985).  Moreover, appellate counsel does not have a

constitutional duty to raise every nonfrivolous issue requested by a petitioner.  *Miller*, 882

F.2d at 1434 n.10 (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)); *see Smith v.*

*Stewart*, 140 F.3d at 1274 n.4 (counsel not required to file "kitchen-sink briefs" because

doing so "is not necessary, and is not even particularly good appellate advocacy"). Courts have frequently observed that the "weeding out of weaker issues is . . . one of the hallmarks of effective appellate advocacy." *Miller*, 882 F.2d at 1434; *see Smith v. Murray*, 477 U.S. 527, 536 (1986). Therefore, even if appellate counsel declines to raise weak issues, counsel will likely remain above an objective standard of competence and will have caused no prejudice. *Id.*

### A.   Procedurally Barred Allegations

In its order addressing the procedural status of Petitioner's claims, the Court determined that Petitioner had properly exhausted the parts of Claim 6 that alleged IAC based on appellate counsel's failure to raise on appeal Claim 2 (judicial bias) and Claim 5 (sentencing judge's failure to consider the cumulative weight of Petitioner's proffered mitigation). (*See* Dkt. 73 at 8-9.) Those claims are addressed on the merits below.

The Court further determined that Petitioner had procedurally defaulted those parts of Claim 6 that alleged IAC based on appellate counsel's failure to raise Claim 1 (*Ake* violation), Claim 4 (consideration of victim statements at sentencing), and Claims 8 and 9 (challenges to Arizona's death penalty statute). (*Id.*) In so ruling, the Court first observed that Petitioner had failed to present any of these separate IAC allegations either on direct appeal or in the first PCR petition. The Court next determined that, although Petitioner did present these allegations in his second PCR petition, the claims were procedurally defaulted because the PCR court found them precluded by Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure (providing preclusion for any ground that has been "waived at trial, on appeal, or in any previous collateral proceeding"); the Court further stated that this preclusion ruling rested on an independent and adequate bar to federal review. (Dkt. 73 at 8-9.)

In a motion for rehearing from this Court's procedural status order, Petitioner correctly pointed out that, following a motion to clarify filed by Petitioner, the state PCR court changed the basis of her preclusion ruling for Petitioner's IAC claims from Rule 32.2(a)(3) to Rule 32.2(a)(2); this rule provides preclusion for claims that were "[f]inally

adjudicated on the merits on appeal or in any previous collateral proceeding." (Dkt. 74 at 5; Dkt. 72, ME at 52-53.)  As Petitioner noted in his motion, this change could be significant for purposes of federal habeas corpus review because under controlling Ninth Circuit precedent, a preclusion ruling based on subsection (a)(2) does not operate as a bar to federal habeas review of a claim.  *See Poland v. Stewart*, 169 F.3d 573, 578 (9th Cir. 1999) (noting that a precluded claim under (a)(2) appears to be a "classic exhausted claim"); *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir.1996).  Nonetheless, this Court declined to reconsider its finding of procedural bar because, regardless of the PCR court's ruling, Petitioner had never exhausted the entirety of Claim 6 to the Arizona Supreme Court; his petition for review from the denial of the second PCR petition failed to include any IAC appellate claims other than the allegation based on counsel's failure to raise the judicial bias claim (Claim 2) on appeal.  (Dkt. 84 at 2.)

In his merits brief, Petitioner again urges reconsideration of the Court's procedural bar ruling as to the defaulted portions of both Claim 6 and 7.  In an extensive footnote, Petitioner first argues that he did not have to exhaust the claims to the Arizona Supreme Court once the PCR judge found them precluded under Rule 32.2(a)(2) on the basis of a previous adjudication.  (Dkt. 85 at 1-2 n.1.)  The Court disagrees.

It is not the province of a state court to determine the exhaustion status of a claim presented in a federal habeas petition.  Resolving whether a petitioner has fairly presented his claim to the state court is an intrinsically federal issue to be determined by the federal court.  *Wyldes v. Hundley*, 69 F.3d 247, 251 (8th Cir. 1995); *Harris v. Champion*, 15 F.3d 1538, 1556 (10th Cir. 1994).  Although the *Ceja* and *Poland* cases recognize that an Arizona preclusion ruling based on Rule 32.2(a)(2) does not constitute an independent and adequate bar to federal review, it does not hold that a such a preclusion ruling supplants the exhaustion requirement.  Indeed, "[e]xhaustion and procedural default are distinct concepts in the habeas context."  *Franklin v. Johnson*, 290 F.3d 1223 (9th Cir. 2002).  The procedural bar doctrine provides that a federal court will not consider a state court judgment that rests on

independent and adequate state grounds. *Id.* "The exhaustion doctrine applies when the state court has never been presented with an opportunity to consider a petitioner's claims." *Id.*

In this case, the Court originally rested its procedural bar ruling on the state court's invocation of Rule 32.2(a)(3), which is an independent and adequate bar to federal review. In response to Petitioner's motion for reconsideration, the Court acknowledged that the state court had changed the basis of its preclusion ruling to subsection (a)(2), which does not serve as a bar to federal review.  The Court nonetheless reaffirmed its procedural bar ruling because Petitioner had never presented the defaulted aspects of Claims 6 and 7 to the state's highest court, as he was required to do under *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999), and 28 U.S.C. § 2254(b)(1)(A).  Petitioner did not raise these allegations on direct appeal or in his first PCR petition.  He raised them in his second PCR petition but did not include them in his petition for review.  Because Petitioner no longer has an available remedy to exhaust the claims, the Court determined that the unexhausted aspects of Claims 6 and 7 were technically exhausted but procedurally defaulted.  *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1.  This procedural default is separate and distinct from the initial procedural default found by the Court on the basis of the PCR court's preclusion ruling; thus, the fact that the PCR court changed its preclusion ruling from subsection (a)(3) to (a)(2) is irrelevant because the claims have never been properly exhausted to the Arizona Supreme Court.

Second, Petitioner argues that the claims were in fact raised in the petition for review of the trial court's denial of the second PCR petition.  The Court again disagrees.  Under the caption, "Issues Presented for Review," the only federal constitutional claims presented for review to the Arizona Supreme Court were those related to his allegation of judicial bias. (Dkt. 72, PCR at 2.)  Because Petitioner never exhausted to the Arizona Supreme Court federal constitutional claims based on appellate counsel's failure to raise Claims 1, 4, 8, and 9 on direct appeal, and he now has no available state remedies to do so, these aspects of Claim 6 are procedurally barred from federal review.  Therefore, the Court again declines Petitioner's request for reconsideration of its July 2006 procedural status order.

**B.    Judicial Bias**

Petitioner contends that his right to the effective assistance of counsel was violated when appellate counsel failed to raise on direct appeal a claim of judicial bias stemming from Judge Hilliard's involvement in pretrial special action proceedings.  Petitioner raised this claim in his second PCR petition, and Judge Hilliard denied it on the merits:

> Hurles appears to claim that appellate counsel was ineffective for failing to raise the issue of this court's disqualification on direct appeal. . . .
>
> Hurles' statement that "effective appellate counsel would not have overlooked" the recusal issue is insufficient by itself to make the requisite showing. . . .
>
> Here, because the issue was waived at trial, the appellate court would review for fundamental error.  On direct review, the Supreme Court upheld this court's rulings in the case as well as the sentence imposed.  The evidence of Hurles' guilt was found to be overwhelming.  Hurles cannot show that the outcome of the appeal would have been any different had appellate counsel raised this issue.
>
> The Court of Appeals has also held that even if a judge should not have presided over a case, error may be harmless.  *State v. Salazar*, supra.  The Court used the three factors cited by the U.S. Supreme Court in *Liljeberg* to determine if the error is reversible:
>
> "(1) the risk of injustice to the parties;
> "(2) the risk that denial of relief will result in injustice in other cases; and
> "(3) the risk of undermining public confidence in the judicial process."  *Salazar*, 182 Ariz. at 987; *Liljeberg*, 486 U.S. at 486.[9]
>
> Even if there was error, each of these factors weighs heavily against reversal.  Hurles' case has been affirmed on direct appeal and in a prior PCR proceeding.  The risk of injustice weighs in favor of the State, not Hurles.  There is also no risk of injustice in other cases because judges no longer file an "improper" response in special actions since the court's decision in *Hurles v. Superior Court.*

(Dkt. 72, ME at 13-14.)  The Arizona Supreme Court denied review without comment.  (Dkt. 72, PR at 400.)

In denying relief on this appellate IAC claim, the PCR court determined that Petitioner had failed to establish any prejudice from appellate counsel's omission of the judicial bias

---

[9]        The court erred in its citations.  The correct cites are: *Salazar*, 182 Ariz. at 609; *Liljeberg*, 486 U.S. at 864.

claim on appeal. Petitioner has cited no authority to establish that the circumstances of Judge Hilliard's participation in the special action proceedings constituted grounds for disqualification under Arizona law. Nor has Petitioner overcome the presumption of correctness that attaches to the state court's conclusion that disqualification was not required under Arizona law. Accordingly, the Court finds that Petitioner has failed to demonstrate a reasonable probability that he would have succeeded on a judicial disqualification claim had it been raised on direct appeal. In addition, for the reasons discussed in addressing Claim 2, the Court concludes that Petitioner has not established a reasonable probability that the outcome of his appeal would have been different had appellate counsel raised a due process claim based on Judge Hilliard's nominal participation as a party to the special action. *See Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel may not be held ineffective for failing to raise claims that have no merit). For these reasons, the state PCR court's denial of relief on this issue was neither contrary to nor an unreasonable application of the principles outlined in *Strickland*.

**B.   Cumulative Weight of Mitigation Evidence**

Petitioner also contends appellate counsel was ineffective for failing to argue on appeal that the sentencing judge had failed to consider the cumulative weight of his proffered mitigation. (Dkt. 26 at 96; Dkt. 85 at 48-55.) Petitioner asserts that the sentencing judge considered evidence of his mental deficits and intoxication only as to whether they adequately supported A.R.S. § 13-703(G)(1), Arizona's statutory "diminished capacity" mitigating factor.[10] (Dkt. 26 at 81; Dkt. 85 at 50.) Although the court found that Petitioner was borderline mentally retarded, had a learning disability, and had consumed alcohol and drugs prior to the offense, Petitioner argues that the court failed to consider and weigh these

---

[10]   A.R.S. § 13-703(G)(1) provides for a "diminished capacity" mitigating factor when a defendant establishes by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

factors as mitigating once it determined that the (G)(1) factor had not been proven. (Dkt. 26 at 82.)  This, Petitioner contends, violated Arizona law and his rights under the Eighth and Fourteenth Amendments; thus, appellate counsel's failure to raise this issue on appeal amounted to ineffective assistance of counsel.

Background

Prior to sentencing, Petitioner filed several "Notices of Mitigation," as well as a memorandum in support.  (*See* ROA I at 210, 219, 222 and 226.)  Petitioner asserted the following as mitigation: (1) his incapacity; (2) duress; (3) personality disorder/mental illness; (4) remorse; (5) early years/prior home life; (6) good behavior while incarcerated; (7) low intelligence and lack of education; and (8) failure to receive appropriate psychological and/or psychiatric treatment while incarcerated.  (*Id.*, 210 at 1, 226 at 2-8.)  In addition to written materials, Petitioner called a number of witnesses at the presentencing hearing to support his claimed mitigating factors, including personnel from the Arizona Department of Corrections, a mitigation investigator, and neuropsychiatrist.

At sentencing, the court first addressed aggravation and found that the State had established that Petitioner committed the murder in an "especially heinous, cruel or depraved manner under A.R.S. § 13-703(F)(6):

> "Cruelty" is the pain and suffering of the victim suffered prior to death, including mental distress as well as physical suffering.  The evidence showed beyond a reasonable doubt that Mrs. Blanton was conscious while being stabbed over 35 times and thereafter.  Fifteen defense stab wounds on the victim's hands indicate that she was struggling to protect herself from the defendant.  She attempted to reach the telephone to get help after being stabbed repeatedly and she responded to a paramedic with sounds, which establishes that she remained conscious after the brutal attack made on her. The court concludes that Kay Blanton would have experienced great terror as she was being stabbed repeatedly by defendant.
>
> Further, defendant committed this murder in a "heinous or depraved" manner by inflicting gratuitous violence on the victim.  In addition to the fifteen defensive stab wounds on the victim's hands, Mrs. Blanton was stabbed eight times in the head and neck region, twelve times in the torso area and twice in her lower extremities.  Of those 37 stab wounds, three wounds each could have been fatal wounds.  Mrs. Blanton literally bled to death.  In addition, the victim received blunt force injuries to her liver which were consistent with her being kicked at least three times with enough force to cause serious injury to her liver.

The attack on Kay Blanton had to have been mind-numbingly terrifying and excruciatingly painful for her. All of these circumstances establish beyond a reasonable doubt that this murder was committed in an especially heinous, cruel and depraved manner.

(ROA I, 228 at 3; *see also* RT 10/13/94 at 13-14.)

Regarding mitigation, the court found none of the statutory mitigating factors outlined in A.R.S. § 13-703(G) to have been proven. (ROA I, 228 at 4-5.) With respect to the (G)(1) diminished capacity factor in particular, the court noted that, although the evidence indicated Petitioner was borderline mentally retarded and learning disabled, he understood the consequences of what he was doing and made efforts to cover up his actions:

> Defendant commented to a witness immediately after the murder as he fled the scene that it was warm out as an explanation why his shirt was rolled up; clearly the shirt was rolled up to cover the blood stains. He executed a plan to leave the Phoenix area within a short time of the murder and disposed of his pants and shirt to get rid of incriminating evidence. While there was evidence presented that alcohol was consumed by defendant a number of hours before the murder, there was not sufficient proof presented to establish incapacity due to alcohol consumption.

(*Id.* at 4.)

Turning to non-statutory mitigation, the court stated that it had considered Petitioner's sentencing memorandum, the testimony and evidence presented at trial and at the sentencing hearing, as well as argument of counsel. (RT 10/13/94 at 18.) The court then stated:

> Number one, the defendant had a deprived childhood and was raised in a clearly dysfunctional home environment. Defendant's father was abusive to defendant and to his siblings, molested his daughter, had sex with his son's girlfriend. Defendant's brothers were in trouble with the law frequently throughout defendant's life and may have abused alcohol throughout their lives.

> Number two, the defendant had good behavior while incarcerated prior to the commission of this crime. While incarcerated defendant attended available counseling sessions and performed well in his work as a cook in the prison kitchen.

> The Court has also considered other factors raised in defendant's supplemental sentencing memorandum in support of mitigating factors, including defendant's low intelligence and lack of education as well as defendant's failure to receive adequate treatment while incarcerated. The Court does not find these factors to be mitigating as discussed previously.

> The Court concludes that the State has proved beyond a reasonable doubt the presence of the aggravated circumstance specified in Arizona Revised

Statutes 13-703(F)(6).  It has failed to proved the existence of [the other] aggravating circumstances . . . .

The Court further concludes the defendant has failed to prove by a preponderance of the evidence the existence of any of the statutory mitigating factors provided by Arizona Revised Statutes 13-703(G)(1) through (5).

The Court also concludes that the defendant has proved by a preponderance of the evidence the following nonstatutory mitigating circumstances: That the defendant was raised in a dysfunctional family and had a difficult home life, and that he performed well in prison prior to the commission of this murder.

The Court concludes that the defendant has not shown that any of the proven mitigating circumstances are sufficiently substantial to call for leniency.

(*Id.* at 18-20.)

On appeal, the Arizona Supreme Court observed that appellate counsel had failed to raise any issues relating to Petitioner's sentencing.  Nonetheless, pursuant to their statutory obligation, the court conducted "a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified."  *Hurles II*, 185 Ariz. at 207, 914 P.2d at 1299.  Regarding mitigation, the court stated:

A difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions.  No such evidence was offered, and the trial judge did not err in concluding that Hurles' family background was not sufficiently mitigating to require a life sentence.

The judge also found that Hurles had good behavior while incarcerated prior to committing the murder.  Taken either by itself or in combination with Hurles' family background, we do not believe this sufficiently mitigates the quality of the aggravating circumstance.  A life sentence would not be more appropriate.

*Id.*, 185 Ariz. at 207-08, 914 P.2d at 1299-1300 (citation omitted).

In his first PCR petition, Petitioner argued generally that appellate counsel was ineffective for failing to argue that imposition of the death penalty was inappropriate.[11]  (Dkt.

---

[11]  Although the appellate IAC claim articulated by Petitioner in these proceedings (failure to raise a claim challenging the trial court's failure to consider the cumulative weight of mitigation) differs from that presented in the first PCR (failure to argue to the Arizona

27, Ex. D at 8, 15.)  The PCR court denied relief, stating:

> As to the last claim, that appellate counsel was ineffective for not arguing on appeal against imposition of the death penalty, this Court is not satisfied that further hearing is necessary since the *Strickland v. Washington* test has not been met.  The Arizona Supreme Court conducted its own, independent review of the sentence imposed in this case and this Court is not satisfied that the outcome on appeal would have been different even if such an argument had been presented.

(Dkt. 27, Ex. J at 3.)  The Arizona Supreme Court denied review without comment.

*Analysis*

A sentencer is required to consider any mitigation offered by a defendant, including non-statutory mitigation.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996).  In *Lockett*, and subsequently in *Eddings v. Oklahoma*, the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence.  *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982).  Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett*, 438 U.S. at 604.  However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence."  *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence.").

In Arizona, sentencing courts have been instructed that if relevant mitigating information does not rise to the level of a statutory mitigating circumstance, it must nonetheless be considered as non-statutory mitigation in order to determine whether the

---

Supreme Court against imposition of the death penalty), Respondents nonetheless conceded that the claim was properly exhausted and should be addressed on the merits by this Court. (Dkt. 73 at 7-8.)  In light of respondents' concession and in light of the fact the Court previously determined that this claim was properly exhausted and appropriate for substantive review, (*see id.* at 7-8, 16-17), the Court will address this claim on the merits.

defendant should be treated with leniency.[12] *See State v. McMurtrey*, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983). In addition, the Arizona Supreme Court has specifically held that the sentencing judge must consider all non-statutory mitigating factors individually and cumulatively. *State v. Gallegos*, 178 Ariz. 1, 22-23, 870 P.2d 1097, 1118-19 (1994). In conducting its own independent review, the Arizona Supreme Court conducts a de novo review of the sentencing court's rulings concerning aggravation and mitigation and independently determines whether the death sentence should be imposed. *See State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-91 (1992); *see also State v. Stuard*, 176 Ariz. 589, 604, 863 P.2d 881, 896 (1993).

Petitioner contends that appellate counsel was ineffective for not presenting to the Arizona Supreme Court a claim alleging trial court error in failing to consider his low intelligence level, learning disabilities, and intoxication as mitigation separate and apart from whether these factors established the (G)(1) "diminished capacity" mitigating factor. However, he does not articulate how he was prejudiced by appellate counsel's failing.

Had the claim been presented, the Arizona Supreme Court would have reviewed the record and observed that the sentencing judge, in her special verdict, expressly stated that she "*considered* nonstatutory mitigating circumstances, including defendant's character, propensities or record" and "also considered other factors . . . *including* defendant's low intelligence and lack of education as well as defendant's failure to receive adequate treatment while incarcerated." (RT 10/13/94 at 19 (emphasis added).) Although the court concluded they were not "mitigating as discussed previously" (presumably with respect to the

---

[12]     As set forth in A.R.S. § 13-703(G),

The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated factors].

- 38 -

diminished capacity statutory mitigating factor), it is clear the court did *consider* this evidence. *See Parker v. Dugger*, 498 U.S. 308, 315 (1991) ("We must assume the trial judge considered all this [mitigation] evidence before passing sentence. For one thing, he said he did."); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting a claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant).

Moreover, as Petitioner acknowledges, the Arizona Supreme Court conducted an independent review of Petitioner's sentence. (Dkt. 26 at 88-89.) The fact that the court's specific mitigation discussion centers on the trial judge's findings does not establish that the court failed to carry out its responsibility to independently consider all of Petitioner's proffered mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (holding that when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of such evidence); *see also Moormann v. Schriro*, 426 F.3d 1044, 1055 (9th Cir. 2005) (noting that "the trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant'") (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)).

In sum, because the state court considered all of Petitioner's proffered mitigation and because the Arizona Supreme Court likewise considered all of Petitioner's proffered mitigation in conducting its independent review, Petitioner cannot establish prejudice from appellate counsel's failure to argue on appeal that the trial court had neglected to consider all of his mitigating evidence. The state PCR court's denial of this claim was neither contrary to nor an unreasonable application of the principles outlined in *Strickland*.

## VI.   Ineffective Assistance at Sentencing

In Claim 7, Petitioner raises one specific claim of ineffective assistance at sentencing.

He alleges sentencing counsel was constitutionally deficient because she failed to ask the defense's mental health expert, Dr. Donald Stonefeld, M.D., to explain specifically how Petitioner's "disabilities related to and mitigated his actions at the time of the crime." (*See* Dkt. 85 at 57.) Petitioner alleges that the Arizona Supreme Court "has repeatedly held that a defendant's dysfunctions carry little or no mitigating weight unless the defendant presents testimony of a causal connection to the homicide." (*Id.*) He contends that counsel's failure to establish this causal connection was both ineffective and prejudicial and warrants federal habeas relief.

Background

In his first PCR petition filed in January 1999, Petitioner argued that counsel was ineffective for failing to present evidence establishing a causal connection between his "dysfunctional background" and "behavior," and his crimes. (Dkt. 27, Ex. D at 7, 14.) In denying relief, the PCR court ruled:

> [T]his court is not satisfied that a colorable claim has been presented. The Arizona Supreme Court conducted its own *de novo* review of the death sentence imposed in this case and found that the non-statutory mitigating factors found by the trial court were not sufficient to call for leniency. The Supreme Court specifically stated that difficult family background does not necessarily have substantial mitigating weight without proof that this background significantly affected defendant's ability to perceive, comprehend or control his actions. The Supreme Court found no such evidence was presented at the trial level and the trial court did not err in imposing the death penalty. No colorable claim has been presented on this issue.

(Dkt. 27, Ex. J at 2-3.) The Arizona Supreme Court denied review without comment.

Analysis

Under Arizona law, while mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, the lack of a causal (explanatory) connection may be taken into account when assessing the weight of the evidence. *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006); *see, e.g., State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not sufficiently substantial to call for leniency, in part, because not tied to the offense). When experts indicate that a defendant "knew right from wrong and could not

establish a causal nexus between the mitigating factors and [the] crime," Arizona courts may ascribe limited value to evidence of an abusive childhood, substance abuse, and personality disorders. *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006); *see also Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005) (noting that federal habeas courts "have rarely granted habeas relief solely upon humanizing, rather than explanatory, mitigation evidence in the face of extensive aggravating circumstances")

Although counsel did not specifically ask Dr. Stonefeld to explain a causal nexus between Petitioner's background and cognitive impairments and his murder of Kay Blanton, a primary thrust of counsel's direct examination at sentencing evinces an attempt on her part to do precisely that. For instance, at the sentencing hearing Dr. Stonefeld stated on direct examination that Petitioner's dysfunctional family background essentially taught him to act in an antisocial manner and to treat women as sex objects. (RT 9/30/94 at 65-66.) Dr. Stonefeld also noted a family predisposition toward alcoholism and, more precisely, noted Petitioner's abuse of alcohol. He opined that such abuse predisposed Petitioner toward suicide and even homicide. (*Id.* at 80-81.)

Dr. Stonefeld stated that he believed Petitioner was "mildly retarded" and concluded he had consumed enough alcohol and inhalants in his life to diminish his mental capacity over time. (*Id.* at 70, 72-76.) He speculated this created an inability to think abstractly and consider the consequences of his actions. (*Id.* at 73-74.) Dr. Stonefeld stated that Petitioner's mental impairments affected him in such a way that he could well have committed the murder even if a policeman had been present. (*Id.* at 94-95.)

While certainly counsel's purpose was to "humanize" Petitioner, counsel's purpose was also clearly to use Petitioner's mental deficiencies and impairments, not to mention the impact of his dysfunctional family history, as a means to *explain* his conduct and show why he lacked the volitional abilities to conform his conduct to society's norms. Thus, the clear thrust of counsel's examination of Dr. Stonefeld was to establish a causal connection between Petitioner's background and mental disabilities and his conduct in murdering Kay

Blanton.  Counsel also emphasized the explanatory aspect of Petitioner's background and deficient mental abilities in her sentencing memorandum.  Counsel again cited expert testimony elicited at trial via Dr. Marc Walter, Ph.D., and from a report filed by Dr. Stonefeld in anticipation of his testimony at sentencing, emphasizing Petitioner's mental impairments, as well as his alcohol and drug abuse contemporaneous to the murder.  Counsel attempted to link these factors to Petitioner's inability to either appreciate the wrongfulness of his conduct or to conform that conduct to the requirements of the law.  (ROA I, 226 at 2-3.) Again, counsel's clear purpose was to use testimony from mental health experts to explain how Petitioner's family history and deficient cognitive abilities affected his behavior in committing the murder.  (*See id.* at 5-6.)

In addition, counsel called a mitigation specialist, Holly Wake, to testify at the sentencing hearing.  Wake prepared a detailed social history of Petitioner.  (*See* ROA I, 222 at Ex. A.)  Although she is not a mental health or psychiatric expert, she testified that she prepared numerous presentence reports in a previous career as a probation officer.  Through her testimony, counsel elicited her belief that Petitioner was intoxicated at the time of the crime and therefore unable to remember his actions.  (*See* RT 9/30/94 at 43.)  In her social history, Wake also cited a 1978 report prepared by Dr. Otto Bendheim in connection with a psychiatric evaluation of Petitioner conducted prior to Petitioner's conviction for sexual molestation of a young boy.  Dr. Bendheim concluded that when a mentally impaired individual like Petitioner becomes severely intoxicated his judgment is affected and his capacity to conform his conduct to the norms of society is reduced.  (ROA I, 222, Ex. A at 5.)

Again, in final argument before sentencing, counsel emphasized that Petitioner's inability to function normally compromised his ability to conform his actions to the norms of society.  (RT 10/13/94 at 5-6.)

In light of these efforts by counsel and the testimony and other evidence presented at the hearing, Petitioner's contention that counsel was deficient for failing to expressly ask Dr.

Stonefeld to make, in one declarative sentence, a causal connection between Petitioner's conduct in the murder and his "disabilities" is without merit.  Any contention that counsel failed to attempt to make such a connection is factually erroneous.  Indeed, the whole thrust of her examination of Dr. Stonefeld was an attempt to do just that.

Petitioner makes much of the fact that the Arizona Supreme Court concluded that counsel failed to establish a causal link between Petitioner's proffered mitigation and his crime.  However, this finding goes not to counsel's lack of an attempt to make such a connection but rather to the persuasiveness of the evidence supporting a causal link. Petitioner's real criticism appears to be with the state court's failure to find his proffered mitigation sufficiently compelling to warrant a sentence less than death. As noted, it is for the sentencer to determine the weight to be given mitigating evidence. *See Eddings*, 455 U.S. at 114-15.  The sentencing court considered all of the mitigation proffered by Petitioner in passing sentence.  Having considered that mitigation, the court's failure to find it sufficiently substantial to warrant leniency does not implicate the Constitution.  *Williams*, 441 F.3d at 1057; *see also Johnson*, 212 Ariz. at 440, 133 P.3d at 750 (where expert indicates a defendant knew right from wrong and could not establish a causal nexus between mitigating factors and the crime, Arizona courts may afford evidence of an abusive childhood, personality disorders and substance abuse limited value); *State v. Greene*, 192 Ariz. 431, 441-42, 967 P.2d 106, 116-17 (1998) (finding no evidence supporting either statutory or non-statutory mitigation based on alleged impairment from drugs where defendant displayed knowledge of wrongfulness of action by taking steps to conceal crime); *State v. Jeffers*, 135 Ariz. 404, 431, 661 P.2d 1105, 1132 (1983) (evidence that defendant was drinking and using narcotics at the time of the murder was not mitigating unless he established that it impaired his ability to appreciate the wrongfulness of his actions).

Moreover, Petitioner cannot establish prejudice flowing from counsel's alleged deficiency.  The State rebutted counsel's efforts to establish a causal connection between Petitioner's "disabilities" and the crime via the testimony of Dr. Alexander Don.  He testified

that Petitioner suffered from no serious mental disorder and was able to appreciate the consequences of his actions.  (*See* RT 9/30/94 at 108-09.)  In light of that testimony, the overwhelming evidence of guilt, the brutal nature of the murder, the testimony Dr. Stonefeld provided at sentencing, and the efforts counsel made to establish a causal connection between Petitioner's conduct and his disabilities, the Court concludes that even had counsel asked Dr. Stonefeld to expressly state that Petitioner's conduct was the direct result of his disabilities, there is no reasonable probability the judge would have handed down a sentence less than death.

For all these reasons Petitioner's claim of ineffective assistance of counsel at sentencing must fail.  The Court concludes the state PCR court's denial of this claim was neither contrary to nor an unreasonable application of the principles enunciated in *Strickland*.

Evidentiary Development

Petitioner seeks further evidentiary development with respect to this claim.  He alleges that he diligently sought such development in state court, but it was denied.  He further alleges that discovery and a hearing would permit him to present evidence establishing a causal connection between his impairments and his conduct at the time of the crime.  He now seeks "funds to investigate and retain qualified mental health experts to present this critical testimony establishing the connection between [his] disabilities, and the evidence that could have been presented if trial counsel had only done so, at a hearing." (Dkt. 85 at 58.) Respondents oppose additional factual development, arguing that Petitioner has failed to explain what information he is seeking and why this information could not have been obtained and presented in state court.  (*See* Dkt. 90 at 54.)

The Court finds that Petitioner was not diligent in seeking evidentiary development in state court with respect to this claim.  Petitioner's only request for evidentiary development in his first PCR petition was in regard to his claim that counsel was ineffective at sentencing for failing to properly evaluate Petitioner for fetal alcohol effect and/or fetal alcohol syndrome, a claim he has chosen not to present to this Court.  (*See* Dkt. 27, Ex. D at 16.)

Petitioner did not specifically seek evidentiary development or a hearing with respect to his claim that counsel failed to ask witnesses at sentencing to establish a causal link between his background, mental impairments, and/or substance abuse and his criminal conduct. In light of this failure, the Court concludes Petitioner was not diligent in seeking evidentiary development in state court and is therefore barred from obtaining the same on federal habeas review. *See* 28 U.S.C. § 2254(e).

In addition, Petitioner provides no specifics as to the type of discovery he seeks. He simply seeks leave to go on a fishing expedition to see if he can discover information to support his claim. *See Rich*, 187 F.3d at 1067. The Court concludes that this claim may be properly resolved on the existing record, and Petitioner has not established good cause for further discovery. In addition, for the reasons discussed in addressing the substance of Petitioner's claim, the claim is clearly meritless and the existing record supports the conclusion that Petitioner has not alleged facts which, if proved, would entitle him to relief. *See Townsend*, 372 U.S. at 313.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce Criminal Justice Act funds that might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability (COA) or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529

U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of the merits of Claims 2 and 7 as well as the procedural default of Claims 6 and 7.  The Court therefore grants a certificate of appealability as to these issues.  For the reasons stated in this Order and the Court's Order regarding the procedural status of Petitioner's claims filed on July 25, 2006 (Dkt. 73), the Court declines to issue a certificate of appealability for Petitioner's remaining claims and procedural issues.

## CONCLUSION

For the reasons set forth above, Petitioner is not entitled to habeas relief.  The Court further finds that evidentiary development is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 25, 26) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered on January 4, 2000 (Dkt. 3) is **VACATED**.

**IT IS FURTHER ORDERED** granting a Certificate of Appealability as to the following issues:

Whether the Court erred in determining that Petitioner was not denied due process of law when the trial judge failed to recuse herself after becoming a party in a pretrial special action proceeding (Claim 2);

Whether the Court erred in determining that Petitioner was not denied the effective assistance of counsel at sentencing when counsel failed to ask her defense expert to specifically explain the relationship between Petitioner's disabilities and his conduct at the time of the crime (Claim 7);

Whether the Court erred in determining that parts of Claims 6 and 7 are procedurally barred from federal habeas review;

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

Dated this 22nd day of September, 2008.


Robert C. Broomfield
Senior United States District Judge