**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Richard Dean Hurles,

              Petitioner,

v.

Charles L. Ryan, et al.,

              Respondent.

No. CV-00-0118-PHX-DLR

**ORDER**

On January 21, 2015, this case was remanded by the Ninth Circuit Court of Appeals. (Doc. 118.) On January 29, 2016, pursuant to the remand order, the Court held an evidentiary hearing on Hurles' claim of judicial bias.

The Ninth Circuit also ordered this Court to reconsider, in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), Hurles' claim that appellate counsel performed ineffectively by failing to raise a claim under *Ake v. Oklahoma*, 470 U.S. 68 (1985). *Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014). The parties briefed this issue. (Docs. 137, 141, 148, 188, 190, 194.)

This order addresses both remanded issues. For the reasons set forth below, the judicial bias claim is denied. The Court also finds that Hurles is not entitled to relief on his ineffective assistance of appellate counsel claim and that an evidentiary hearing on the claim is not necessary.

**JUDICIAL BIAS**

## I.      Background

The following facts are taken from the opinion and order remanding the case, *Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014), the Arizona Supreme Court's opinion affirming Hurles' conviction and sentence, *State v. Hurles*, 914 P.2d 1291 (Ariz. 1996) (en banc), and this Court's review of the record.

### A.      Trial

Hurles, on parole after serving nearly fifteen years in prison for sexually assaulting two young boys, went to the library in Buckeye, Arizona, on the afternoon of November 12, 1992.  After the last patron left, Hurles locked the front doors and attacked librarian Kay Blanton in the back room.  He attempted to rape her, stabbed her thirty-seven times, and kicked her so violently that he tore her liver.  She later died of her injuries.

Hurles left the library and proceeded to the home of his nephew, Thomas.  He told Thomas that he had been in a fight with a Spanish man at the library.  After changing his clothes and cleaning up, Hurles asked Thomas for a ride to Phoenix.  On the way to Phoenix, Hurles had Thomas pull over so he could discard his bloody clothes.  Thomas dropped Hurles off at the bus station in Phoenix, where Hurles purchased a ticket to Las Vegas.  Thomas returned to Buckeye and contacted the police.  Police intercepted the bus and arrested Hurles.

Hurles was charged with burglary, first-degree murder, first-degree felony murder, and attempted sexual assault.  A jury found him guilty of all charges.

The court then conducted an aggravation and mitigation hearing to determine the appropriate sentence.  Hurles offered mitigating evidence about his dysfunctional family background, cognitive deficiencies, long-term substance abuse, mental illness, good behavior while incarcerated, and an expert opinion that he suffered from diminished capacity at the time of the crime.

The court found one statutory aggravating factor: that Hurles committed the crime in an especially cruel, heinous or depraved manner.  The court found two nonstatutory mitigating circumstances: that Hurles suffered a deprived childhood in a dysfunctional

home and that he had behaved well in prison prior to the underlying crime.  The court concluded that these circumstances did not warrant leniency and sentenced Hurles to death.  The Arizona Supreme Court affirmed.  *Hurles*, 914 P.2d 1291.

### B.   Special Action

Prior to trial, Hurles moved for appointment of a second attorney to assist in his defense.  (SA at 30-34.)[1]  The trial judge, Maricopa County Superior Court Judge Ruth Hilliard, summarily denied the motion.  (*Id.* at 36.)  Hurles sought interlocutory relief in the Arizona Court of Appeals, filing a petition for special action challenging the trial court's ruling and asserting that defendants in capital cases are entitled to two lawyers. (*Id.* at 38.)   The named parties were Richard Hurles, Petitioner; Maricopa County Superior Court and Judge Hilliard, Respondents; and Maricopa County Attorney Richard Romley as the "Real Party in Interest."  (SA at 64.)

The Maricopa County Attorney's Office, which was prosecuting the case, declined to respond to the special action because under state law it lacked standing in the selection of defense counsel.  *See Hurles v. Super. Ct. in and for the Cty. of Maricopa*, 849 P.2d 1, 2 (Ariz. Ct. App. 1993).  At the request of the Presiding Criminal Judge of the Maricopa County Superior Court, Ronald Reinstein, the Arizona Attorney General filed a response. *Id.*

The response was prepared by Assistant Attorney General Colleen French.  The response began, "Respondent Judge Hilliard, through her attorneys undersigned, hereby enters her response to Petitioner's petition for special action."  (S.A. at 64.)  In its "Statement of the Facts," the response described the murder as "brutal" and characterized the State's case against Hurles as "very simple and straightforward, compared to other capital cases."  (*Id.* at 65, 66.)  The response then addressed Hurles' legal arguments, including his request that the Arizona Court of Appeals follow California law, which presumed the necessity of second chair counsel in death-penalty cases, and his contention

---

[1] "SA" refers to documents filed in Petitioner's Special Action Proceeding before the Arizona Court of Appeals (Case No. CV-93-0134-SA).  Copies of these records as well as the original trial transcripts and appellate briefs were provided to this Court by the Arizona Supreme Court on August 24, 2000.

that the lack of second counsel would violate his Sixth Amendment and equal protection rights.  (*Id.* at 67-73.)   Finally, the response suggested that appointed counsel was ethically bound to withdraw from the case, and possibly the Maricopa County list of contract defense lawyers, if she believed herself incapable of competently representing Hurles.  (*Id.* at 73.)

The Arizona Court of Appeals ordered supplemental briefing on the issue of Judge Hilliard's standing.  French authored the response, arguing that judges had an interest in retaining discretion with respect to the appointment of counsel in capital cases.  (*Id.* at 78.)   Specifically, French argued that it was appropriate for Judge Hilliard and the superior court bench to defend their interest in the bench's authority to make case-by-case determinations in the appointment of capital counsel because the Real Party in Interest did not have standing to litigate the case.  (*Id.*)

In a published decision, the Arizona Court of Appeals declined to accept jurisdiction on the merits, concluding it was premature in light of Hurles' failure to make a particularized showing on the need for second counsel in his case.  *Hurles v. Super. Ct.*, 849 P.2d at 2.  However, the court addressed Judge Hilliard's standing, holding that a responsive pleading from a trial judge may be filed only if the purpose is to explain or defend an administrative practice, policy, or local rule, not simply to advocate the correctness of the judge's individual ruling.  *Id.* at 3.  Because the response filed by the Arizona Attorney General on behalf of Judge Hilliard fell into the inappropriate "I-ruled-correctly" category, the appellate court declined to consider the pleading.[2]  *Id.* at 4.  As to Judge Hilliard's involvement in the filing of the responsive pleading, the court observed:

_____

[2]  French, representing the Maricopa Superior Court and Judge Reinstein as presiding criminal judge, subsequently filed a special action in the Arizona Supreme Court, naming as Respondents the judges of the Arizona Court of Appeals.  (CV-93-01335-SA at 1.)  The special action contested the court of appeals' ruling that judges who are named as respondents in special actions challenging their rulings do not have standing to appear and respond.  (*Id.* at 2.)  The Attorney General also filed a special action on the question of whether it was entitled to represent judges in special actions on the issue of appointment of counsel.  (SA at 1.)   The Attorney General attached to its reply an affidavit from Judge Reinstein attesting that, due to budget cuts and an increased number of requests, the Maricopa County Superior Court addressed requests for additional counsel on a case-by-case basis.  (*Id.* at 105.)  The special actions were consolidated.  (*Id.*

> The record does not indicate whether Judge Hilliard, the nominal respondent, actually authorized such a pleading to be filed. From the statement of the Attorney General at oral argument, the pleading was requested by the presiding criminal judge, not by Judge Hilliard, and there was no contact between Judge Hilliard and the Attorney General's office as the pleading was prepared.

*Id.* at 2 n.2.

Judge Hilliard continued to preside in the case through trial, sentencing, and the first post-conviction relief ("PCR") proceeding.

### C.    Second PCR Proceeding

In his second PCR petition, Hurles raised a claim alleging that his Fourteenth Amendment rights had been violated when Judge Hilliard failed to recuse herself from his case after becoming a party in the special action proceedings.  (Doc. 72, PCR at 24-45, 163-72.)[3]  Hurles also filed an accompanying Motion to Recuse Judge Hilliard.  (*Id.* at 129-44.)  Judge Hilliard referred the matter to the Presiding Judge, who appointed Judge Eddward Ballinger, Jr., to rule on the motion.  (*Id.*, ME at 1-2.)  Judge Ballinger denied the motion, stating that "[w]ith respect to the objective evaluation of the judge's actions in this matter, the Court finds no basis to transfer this case."  (*Id.*, ME at 3.)

Judge Hilliard ultimately denied relief on Hurles' second PCR petition.  With respect to his judicial bias claim, the court ruled:

> Defendant argues in claim 2 that this Judge should have recused herself from consideration of the first Petition for Post-Conviction Relief based on the Court of Appeals' ruling in *Hurles v. Superior Court*, 174 Ariz. 331, 849 P.2d 1 (App. 1993). Defendant argues that because the Court of Appeals determined that the response filed on behalf of this judge, (without her input) was wrong, this judge is thereby precluded from hearing any further matters in this case. However, Rule 81 of the Arizona Rules of the Supreme Court, Canon 3(E)(1) provides that "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ." The test is an objective one: whether a

at 93.)  The Arizona Supreme Court declined to accept jurisdiction.  (*Id.* at 106.)

[3] "Doc. 72" consists of separately indexed and paginated PCR documents, minute entries ("ME"), and petition for review ("PR") documents from Petitioner's second PCR proceeding (Case No. CR-05-0118-PC).

reasonable and objective person knowing all the facts would harbor doubts concerning the judge's impartiality. *State ex rel Corbin v. Superior Court*, 155 Ariz. 560, 748 P.2d 1184 (1987); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S. Ct. 2194, 100 L.Ed.2d 855 (1988).

The trial judge is presumed to be impartial and the party who seeks recusal must prove the grounds for disqualification by a preponderance of the evidence. *State v. Carver*, 160 Ariz. 167, 771 P.2d 1382 (1989); *State v. Salazar*, 182 Ariz. 604, 898 P.2d 982 (App. 1995). The facts here do not support disqualification and another judge, Judge Ballinger, so determined. In the special action in this case, the Attorney General filed a response on this judge's behalf but without any specific authorization of such a pleading. No contact was made by this judge with the Attorney General and this judge was a nominal party only. The special action was resolved five years before the first PCR was filed. Based on the circumstances of this case, the Court finds that a reasonable and objective person would not find partiality.

As in *Carver*, Hurles simply alleges bias and prejudice but offers no factual evidence to support his allegations. There is no allegation of partiality during the trial or that rulings or conduct during the first PCR demonstrated any bias. "Appearance of interest or prejudice is more than the speculation suggested by the defendant. It occurs when the judge abandons the judicial role and acts in favor of one party or another." Hurles has failed to overcome the presumption of impartiality.

(*Id.*, ME at 17-18.)

Judge Hilliard further held that, even if it was error not to recuse herself, such error was harmless in light of the overwhelming evidence of Hurles' guilt and the absence of any risk that injustice would occur in other cases or that public confidence in the judicial process would be undermined. (*Id.* at 19.) The Arizona Supreme Court summarily denied review.

### D.    Habeas Review

On habeas review, this Court denied the judicial bias claim on the merits. The Court found that:

[N]othing in the record contradicts the assurances of Judge Hilliard and Assistant Arizona Attorney General French that the judge played no role in the preparation and filing of the special action brief. Petitioner has cited no

evidence to contradict their statements regarding the judge's role, or lack thereof, in preparation of the brief.  Nor is there any evidence to refute the conclusion that the positions raised in the brief were anything other than the positions of the Arizona Attorney General.

(Doc. 99 at 17.)

In remanding the case, the Ninth Circuit found that Judge Hilliard came to an unreasonable determination of the facts in denying Hurles' judicial bias claim, and that this Court abused its discretion by denying the claim without holding an evidentiary hearing.  *Hurles*, 752 F.3d at 792.  The Ninth Circuit explained that "this case presents an especially troubling example of defective fact-finding because the facts Judge Hilliard 'found' involved her own conduct, and she based those 'findings' on her untested memory and understanding of the events."  *Id.* at 791.

The Ninth Circuit directed this Court to hold an evidentiary hearing to determine "whether the probability that Judge Hilliard harbored actual [bias] against Hurles is too high to be constitutionally tolerable."  *Id.* at 792 (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)).  To answer that question, after noting the "tenor of Judge Hilliard's responsive pleading in the special action," the Ninth Circuit listed the following factors for this Court to consider: (1) whether Judge Hilliard participated in the special action proceedings as more than a nominal party; (2) had contact with French; (3) commissioned or authorized the responsive pleading; or (4) provided any input on the brief. *Id.*

### E.    Evidentiary Hearing Testimony

The Court held an evidentiary hearing on January 29, 2016.  Hurles called four witnesses: Colleen French; Judge Hilliard; Mark Harrison, a judicial ethics expert; and Noel Fidel, a former Maricopa County Superior Court and Arizona Court of Appeals judge.

Colleen French testified that she was assigned to file the response to Hurles' special action by her supervisor, Paul McMurdie, who was asked to respond to the special action by Presiding Judge Reinstein, not by Judge Hilliard.  (RT 1/29/16 at 32.)  It was at

- 7 -

Judge Reinstein's "insistence" that she filed the response.  (*Id.* at 35.)  He felt "very strongly" about the issue involved.  (*Id.*)

French testified that, right after she was assigned the case, she called Judge Hilliard to inform the judge that she was filing a response to the special action.  (*Id.* at 34.)  Judge Hilliard was "not cooperative," but she did not tell French not to file the response.  (*Id.* at 23.)  Judge Hilliard provided no assistance in preparing the brief.  (*Id.* at 34.)  French possibly sent a draft of the response to Judge Hilliard.  (*Id.* at 35.)  She sent a copy of the filing to Judge Hilliard, as required by the rules.  (*Id* at 24.)  She received nothing from Judge Hilliard.  (*Id.* at 36.)  French spoke with Judge Hilliard only once.  (*Id.* at 34.)  She felt her client was the Superior Court as well as Judge Hilliard.  (*Id.* at 25, 36.)  Judge Hilliard did not authorize the response and provided no input.  (*Id.* at 41.)  The language in the response was French's, and the characterization of the State's evidence came from the prosecuting attorney.  (*Id.* at 37-40.)  French testified that Judge Hilliard was "not pleased" that the response was filed.  (*Id.* at 42.)

Judge Hilliard testified that she had no recollection of the special action, nor did she recall ever speaking with French.  (*Id.* at 60.)  She testified that she did not request a special action be filed or solicit a response.  (*Id.* at 74.)  She did not recall reading the response, and it was possible she never saw it.  (*Id.* at 72.)  She did not dispute that her chambers received a copy of the response.  (*Id.* at 62.)

Judge Hilliard testified that she offered no input and received no drafts of the response.  (*Id.* at 75, 83.)  She testified that, although the Attorney General represented her position, she was not responsible for the language in the response.  (*Id.* at 78-79.)

She also testified that appearing in a special action to defend one of her rulings is "not something I have done."  (*Id.* at 67.)  As a matter of policy, she generally did not read special actions, but forwarded them to the presiding judge.  (*Id.* at 73.)  Judge Hilliard believed that judges were represented by the Attorney General's Office as a matter of course in all special actions.  (*Id.* at 63, 77.)

Judge Hilliard testified that it was her practice to rule on motions, such as the motion for second counsel, after consulting with other more experienced criminal judges

or the presiding criminal judge.  (*Id.* at 70.)  She is sure that on such a motion she would have consulted with multiple other judges.  (*Id.*)  She recalled that at the time of Hurles' trial there were financial issues that might have affected the appointment of second-chair counsel.  (*Id.* at 71.)

Finally, Judge Hilliard testified that she did not recall whether she had notes on the case.  (*Id.* at 68.)  However, she disposed of whatever notes she did have when she retired from the bench.  (*Id.*)

Mark Harrison, Petitioner's expert witness on judicial ethics, testified that Judge Hilliard violated the Arizona Code of Judicial Conduct, Canons 1 and 3, by becoming personally involved in the defense of her order and continuing to preside over the case, such that her impartiality might reasonably have been questioned.  (*Id.* at 102.)

Noel Fidel, a former Maricopa County Superior Court and Arizona Court of Appeals judge, testified, in contradiction of Judge Hilliard's belief, that it was extraordinarily rare for judges to appear and be represented in special actions.  (*Id.* at 132.)  He testified that the Attorney General represented only judges who were actual, rather than nominal, parties.  (*Id.* at 132-33.)  However, in closing arguments, counsel for Hurles conceded that he was not challenging the veracity of Judge Hilliard or her testimony.  (*Id.* at 142-43.)

## II.   Analysis

The Court finds that an average judge, sitting in Judge Hilliard's position, was likely to sit as a neutral, unbiased arbiter.  Although the filing of a response in her name and the tenor of the response arguably suggested that Judge Hilliard was enmeshed and embroiled in controversy with Hurles and his counsel, the facts do not bear that out.

### A.   Findings of Fact

Taking into account the concerns raised by the Ninth Circuit in its remand order, the Court makes the following findings of fact based on the testimony at the evidentiary hearing and the record as a whole:

(1)    Judge Hilliard ruled on the motion for second counsel after consulting with other more experienced criminal judges.  When she was served with the special action,

Judge Hilliard followed the court protocol, as she understood it, by forwarding the complaint to the presiding criminal judge, Judge Reinstein.

(2)     Judge Reinstein had strong feelings about the issue raised in the special action.  He made the decision to request that the Arizona Attorney General respond.

(3)     The case was assigned to French by her supervisor.  From the time she was assigned the case, French understood she was representing the presiding criminal judge and the superior court at the behest of the criminal presiding judge.  She understood she was not representing Judge Hilliard but it never crossed her mind to respond in the name of the presiding judge.

(4)     French filed the response in the name of Judge Hilliard because Judge Hilliard was the named nominal defendant.  French did not recognize the potential for the appearance of a conflict created by responding in the trial judge's name.

(5)     Though it was not settled, Arizona law at the time arguably could have been interpreted to support French's position that the trial judge had an unequivocal right to respond to a special action.  *Hurles v. Super. Ct.*, 849 P.2d at 3.

(6)     Judge Hilliard did not participate in the special action proceedings as more than a nominal party.  Although she was provided copies of the briefs, she did not read them or provide French with any input.

(7)     Judge Hilliard had contact with French concerning the special action on one occasion.  On that occasion, French phoned Judge Hilliard to advise her that French would be preparing and filing a response.  Judge Hilliard expressed disapproval that a response was going to be filed on her behalf.

**B.     Conclusions of Law**

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  *See In re Murchison*, 349 U.S. 133, 136 (1955); *Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir. 2010) ("Due process requires that trials be conducted free of actual bias as well as the appearance of bias.").  An appearance of bias—as opposed to evidence of actual bias—necessitates recusal when the judge becomes embroiled in a running, bitter controversy with one of the litigants.  *Crater v. Galaza*, 491 F.3d 1119,

1131 (9th Cir. 2007) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  Due process also requires a judge to recuse herself when "it is plain that [s]he was so enmeshed in matters involving petitioner as to make it most appropriate for another judge to sit." *Johnson v. Mississippi*, 403 U.S. 212, 215-16 (1971).  The inquiry is objective.  "We do not ask whether [the judge] actually harbored subjective bias.  Rather, we ask whether the average judge in her position was likely to be neutral or whether there existed an unconstitutional potential for bias."  *Hurles*, 752 F.3d at 788.

Hurles alleges bias arising from Judge Hilliard's role as a responsive party in the special action.  However, Judge Hilliard was named only as a "nominal" party under the state rules for special actions.  *See Hurles v. Super. Ct.*, 849 P.2d at 2.  Although the Arizona Attorney General filed a brief in the judge's name, the evidence presented at the hearing is consistent with the record that Judge Hilliard was not involved in the proceedings or in the preparation of that brief.

Judge Hilliard testified that she presently has no recollection of the special action.  However, French's testimony about the judge's lack of involvement in the special action is supported elsewhere in the record.  Judge Hilliard noted in her order during the second PCR proceedings in 2002 that the actions by the Attorney General in response to the special action petition were made without her input, that "[n]o contact was made by [her] with the Attorney General," and that she was a "nominal party only."  (*See* Doc. 72, ME 8/13/02 at 2.)  Likewise, at the time the special action was being litigated, the Arizona Court of Appeals noted French's statement at oral argument that "the [Attorney General's] pleading was requested by the presiding criminal judge not by Judge Hilliard, and there was no contact between Judge Hilliard and the Attorney General's office as the pleading was prepared."  *Hurles v. Super. Ct.*, 849 P.2d at 2 n.2.  At the evidentiary hearing, French testified that her single contact with Judge Hilliard occurred before she prepared the response.   Finally, again during the second PCR proceedings, an independent judge performed an "objective evaluation" and denied Hurles' motion to recuse Judge Hilliard.  (Doc. 72, ME at 3.)

There is no evidence of personal antagonism between Hurles and Judge Hilliard that could be viewed as compromising the judge's impartiality.  There were no personal attacks on the judge, and Judge Hilliard was not personally embroiled in a controversy with Hurles.  Judge Hilliard was not enmeshed in matters involving Hurles, and the question at issue in Hurles' special action—whether under state law he was entitled to appointment of a second attorney—did not touch upon any substantive issues relating to Hurles' guilt or innocence.

The facts in *Crater* are particularly instructive.  There, the defendant alleged the trial judge was biased because at an in-camera pretrial conference the judge told him he should accept a plea deal offered by the State.  The judge, who had presided over the trial of Crater's co-defendant, stated that "based upon what I've heard about this case, I'm real sure that you're going to be convicted of all of those robberies, that you're going to be convicted of shooting the first robbery victim."  *Crater*, 491 F.3d at 1130.  The judge also told Crater that "[a] jury is not going to like you" and "most judges . . . would throw the book at you."  *Id.* at 1130-31.  The Ninth Circuit found no constitutional violation.  It concluded that "the judge's predictions did not suggest bias," explaining that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Id.* at 1132 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

The circumstances here contrast sharply with those in *Crater*.  Judge Hilliard personally said nothing about the merits of the case against Hurles.  The response filed on her behalf does not suggest any belief about Hurles' guilt remotely akin to the remarks made by the trial judge in *Crater*—remarks that the Ninth Circuit found insufficient to compromise Crater's due process rights in the absence of that judge's recusal.  Neither the tenor nor the contents of the response are attributable to Judge Hilliard.

Ultimately, Hurles argues that Judge Hilliard participated in the special action simply by referring it to Judge Reinstein, knowing or expecting that he would direct a

response to be filed, and that she knew the response was filed in her name but did not stop it.   But this is insufficient to establish judicial bias.   Judge Hilliard was not personally invested in the issue raised by the special action. It was Judge Hilliard's practice to rule on motions, such as the motion for second counsel, after consulting with other more experienced criminal judges or the presiding criminal judge.   She is sure she would have followed that practice with the motion for second counsel.   The preservation of the discretion of trial judges to decide when to appoint a second defense attorney in a capital case was an issue of concern for the Presiding Criminal Judge, and it was Judge Reinstein who pursued the defense of the special action.  Judge Hilliard herself had little or no interest in that issue and paid no attention to the filings.  She was merely a nominal party.  Judge Hilliard's tenuous involvement in the special action did not affect her ability to sit as an unbiased judge.

## III.    Conclusion

Judge Hilliard's nominal participation in the special action did not cause her to become "so enmeshed in matters involving [Hurles] as to make it appropriate for another judge to sit" or become "embroiled in a running, bitter controversy" with Hurles or his counsel. *Hurles*, 752 F.3d at 792.  Under the facts established at the evidentiary hearing, which confirmed Judge Hilliard's findings during the second PCR proceeding, no unconstitutional risk of bias arose from the fact that the response to Hurles' special action was filed on her behalf.  In sum, the average judge in Judge Hilliard's position was likely to sit as a neutral, unbiased arbiter and there was no unconstitutional risk of bias.

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

The Ninth Circuit directed this Court to reconsider, pursuant to *Martinez*, Hurles' claim that his appellate counsel performed ineffectively by failing to raise a claim challenging the trial court's denial of funds for neurological testing, in violation of *Ake*. *Hurles*, 752 F.3d at 792.  This Court had found the claim, included in Claim 6 of Hurles' amended habeas petition, procedurally defaulted because Hurles did not raise it in state court. (Doc. 73 at 8-9.)

## I.    Background

Hurles' trial counsel filed notice of an insanity defense and moved for a competency hearing.  (ROA 52, 53.)  The court granted the motion.  (ME 5/6/93.)

At the pre-trial competency hearing, Hurles' expert, neuropsychologist Dr. Marc Stuart Walter, testified that his testing suggested Hurles had "areas of the brain that are dysfunctional."  (RT 11/19/93 at 42-43.)  Dr. Walter did not know the extent of the brain damage.  (*Id.* at 43.)  He was "fairly certain" that "further neurological studies, such as sophisticated brain mapping" would show brain damage but could not "guarantee" it.  (*Id.*)

Dr. Walter explained that diagnosing such an injury would require more sophisticated testing than MRI and CAT scans.  (*Id.* at 43-44.)  He recommended a "Beam [Brain Electrical Activity Mapping] Study or a Computerized Topographic Mapping [CTM] Test which is a more sensitive test of brain dysfunction."  (*Id.* at 45.)  Dr. Walter was not qualified to perform these neurological studies.  (*Id.* at 48.)

The State's expert, psychiatrist Dr. Alexander Don, agreed that some objective neurological investigation, like a CTM scan or electroencephalogram, would be useful in detecting brain impairment.  (RT 11/23/93 at 14.)  He recommended "either a CT scan or an MRI.  The computer EG scan is not regarded as a useful tool in psychiatric testing at this time."  (*Id.*)  However, from his interview with Hurles, Dr. Don did not see any type of organic impairment warranting a CT scan or MRI.  (*Id.* at 16.)

The court found Hurles competent to stand trial.  (ME 11/23/93.)

On December 6, 1993, Hurles' trial counsel filed an *ex parte* request with the trial court for funds to pay Dr. Drake Duane, a behavioral neurologist, to perform "Electrophysiological studies" on Hurles.  (Doc. 137-1 at 2.)  Counsel's request had previously been denied by the Maricopa County Superior Court Contract Administrator.  (*Id.* at 6.)  In January 1994, counsel supplemented her *ex parte* request with information concerning the "scientific acceptability" of the CTM "brain mapping procedure."  (Doc. 141, Ex. C at 1.)

On February 14, 1994, the trial court ruled that it could not consider counsel's

request on an *ex parte* basis.[4]   The court ordered that, "[i]f defendant chooses to assert the Motion and Request, a copy must be sent to the State and the State must have an opportunity to respond."  (Doc. 141, Ex. D.)  As Respondents note, the record does not reflect that Hurles ever renewed his request for brain mapping before trial.

After the trial commenced, there was further discussion about the *ex parte* request for funding.  (RT 3/18/94 at 3-7.)  Hurles' trial counsel thought she had filed a motion to reconsider, but the court believed it had ruled on everything and no motions were pending.  (*Id*. at 4.)  The court then reiterated that "[s]o the record is clear, there cannot be any further *ex parte* motions of any sort."  (*Id*.)  The record shows that the only ruling concerning the request for funds to conduct a CTM examination was the court's February 14, 1994 order.  (Doc. 141, Exs. D, F.)

At trial, Dr. Walter testified about the neuropsychological tests he performed on Hurles.  (RT 4/12/94 at 13-23.)   Based on these test results, together with Hurles' dysfunctional family background and history of substance abuse, Dr. Walters testified that Hurles suffered from mild brain damage, which nevertheless can have "very serious consequences."  (*Id.* at 36.)  He also diagnosed Hurles with organic mental disorder, with a thought disorder (learning disability), and with organic personality disorder.  (*Id.* at 52.)

Dr. Walter testified that Hurles was in a "psychotic state of mind" at the time of the murder.  (*Id.* at 43.)  He testified that Hurles did not know what he was doing or that it was wrong.  (*Id.*)

Dr. Don, testifying for the State, discussed testing that could be done to determine whether a person suffered from mild brain damage.  (RT 4/13/94 at 27-29.)  He then explained that the correlation between a finding of brain damage and its effect on a person's functionality is "quite tenuous, meaning that there aren't really good correlations between what is found on neuropsychological testing or what is found on an EEG or what is found on a CAT scan and an individual's ability to function."  (*Id*. at 30-31.)

Dr. Don testified that Hurles was not insane at the time of the murder.  (*Id*. at 15.)

---

[4]  The court relied on a recent Arizona Supreme Court decision, *State v. Apelt (Michael)*, 861 P.2d 634, 650 (Ariz. 1993).

He "wasn't suffering from a mental illness that affected him at the time the crime occurred such that he knew neither the nature or quality or the wrongfulness of his conduct." (*Id.*)

After the guilt phase of trial but before sentencing, the court approved funds for a brain scan. *See Hurles*, 752 F.3d at 782. Dr. Duane conducted the CTM scan. He summarized his findings as follows:

> The routine electroencephalogram shows a mild and nonspecific abnormality in the left frontal region. The date of its development is indeterminate. The risk for epileptogenesis would appear to be low. The differential factors include developmental deviation of cerebral organization, prior head injury versus focal infection. Structural disease, such as neoplasm, is improbable.
>
> The FFT analysis confirms the above observations to be valid. There is no evidence of epileptogenesis. *The N-100/P-300 yield a slightly long latency for the N-100 which may represent developmental anomalous cognition as is common in attention deficit disorder.* A mood disorder would appear to be absent. The visual evoked potential studies yield no definitive evidence of dysfunction within the visual system nor additional evidence of cerebral dysfunction.
>
> In summary, *the data reveal subtle nonspecific abnormalities in the left frontal areas, associated with mild processing difficulty* which may be developmental or acquired without risk for epileptogenesis and no evidence of intercurrent anxiety or depression. These data provide a physiologic baseline against which future comparison may be made. *These studies supplement, but do not replace clinical judgments.*

(Doc. 25, Ex. 1 (emphasis added).)

At the sentencing hearing, Hurles presented an expert, Dr. Donald Stonefeld, who diagnosed Hurles as suffering from the following conditions: dysthymic disorder, mild retardation, learning disorder NOS, substance-induced persisting dementia, and substance-induced psychotic disorder with hallucinations. (RT 9/30/94 at 66-77.) Dr. Stonefeld reviewed the "brain mapping data" in reaching his opinions. (*Id.* at 85.) Nonetheless, although he opined that Hurles had brain damage, Stonefeld testified that his opinion was not based on any imaging tests but on Dr. Walter's neuropsychological

testing.  (*Id.* at 73, 88-89.)  Dr. Stonefeld did not discuss the results of the brain mapping test.

Despite Dr. Stonefeld's testimony, the trial court found that the statutory "diminished capacity" mitigating factor, set forth in A.R.S. § 13-751(G)(1), was not proved.  The Arizona Supreme Court affirmed the death sentence on independent review. *Hurles*, 914 P.2d at 1299-1300.  Appellate counsel did not raise an *Ake* claim challenging the trial court's initial denial of funds for a CTM scan.

## II.   Applicable Law

Federal review generally is not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In such situations, federal habeas review is barred unless the petitioner can demonstrate "cause" for his failure to follow the state procedural rule, and prejudice or a fundamental miscarriage of justice.  *Id.  Coleman* further held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim.  *Id.*

In *Martinez*, however, the Court announced a new, "narrow exception" to the rule set out in *Coleman*.  The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez*, 132 S. Ct. at 1320)).

The Ninth Circuit has expanded *Martinez* to include procedurally defaulted claims of ineffective assistance of appellate counsel.  *Nguyen v. Curry*, 736 F.3d 1287, 1294-96

(9th Cir. 2013); *see Hurles*, 752 F.3d at 781.

Accordingly, under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim "by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc); *Dickens v. Ryan*, 740 F.3d 1302, 1319-20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).

The Ninth Circuit has elaborated on the cause standard set out in *Martinez*.   In *Clabourne*, the court explained that "to establish 'cause,' [the petitioner] must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland.   Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citations omitted).   Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.*

Under *Martinez*, a claim is substantial for prejudice purposes if it meets the standard for issuing a certificate of appealability.   *Martinez*, 132 S. Ct. 1318-19. According to that standard, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (citing *Martinez*, 132 S. Ct. at 1318-19).

Ineffective assistance of appellate counsel claims are evaluated under the standard set forth in *Strickland.   Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see Moormann v.*

*Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).  First, Hurles must show that appellate counsel's performance was objectively unreasonable, which requires him to demonstrate that counsel acted unreasonably in failing to discover and brief a meritorious issue.  *Id.* Second, Hurles has the burden of showing prejudice, which in this context means he must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the *Ake* claim, he would have prevailed in his appeal.  *Id.*

The Ninth Circuit has explained that in applying *Strickland* to a claim of ineffective assistance of appellate counsel:

> [t]hese two prongs partially overlap. . . .  In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir. 1989) (citations and footnotes omitted); *see Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001).  The salient question in analyzing a claim of ineffective assistance of appellate counsel is whether the unraised issue, if raised, would have "led to a reasonable probability of reversal." *Id.* at 1434-35.

In *Ake*, the Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense."  470 U.S. at 83.  Failure to appoint an expert under *Ake* is subject to harmless error analysis.  *See Chaney v. Stewart*, 156 F.3d 921, 924 (9th Cir. 1998).

## III.   Analysis

In remanding for reconsideration of this ineffective assistance of appellate counsel claim, the Ninth Circuit explained:

> Here, the sole defense at guilt was insanity, and Hurles's expert

offered testimony in support of that defense.  The state offered a contrary opinion, resulting in a battle of the experts.  Both experts agreed that objective testing could show brain damage, but the trial court denied funding for this test until after the guilt phase concluded.  The state used the absence of such an objective test to its advantage, tipping the scales of the battle of the experts in its favor.

Appellate counsel's failure to raise this claim on appeal was deficient.  Appellate counsel "unreasonably failed to discover nonfrivolous issues" to appeal, and Hurles's *Ake* claim was "clearly stronger than those presented" on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285, 288, 120 S. Ct. 746, 145 L.Ed.2d 756 (2000) (internal quotation marks omitted).  Hurles also can show prejudice from this error, as the brain scan conducted after trial showed brain damage.  The Supreme Court held in *Martinez* that "[a]llowing a federal habeas court to hear a claim of ineffective assistance of [appellate] counsel when an attorney's errors . . . caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken . . . with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim."  *Martinez*, 132 S. Ct. at 1318.  We find cause sufficient to excuse the procedural default of Hurles's *Ake* claim and remand.

*Hurles*, 752 F.3d at 783.   The court then considered Hurles' remaining ineffective assistance of appellate counsel claims before concluding:

We remand for consideration by the district court in the first instance Hurles's claim that appellate counsel failed to raise the *Ake* claim on appeal.  The district court should afford Hurles an evidentiary hearing on this issue if one is warranted and shall enter a new judgment on the remanded claim.

*Id.* at 784.

The Court draws several conclusions from these passages.  First, in finding cause for the default, the Ninth Circuit has implicitly determined that PCR counsel's performance in failing to raise the appellate ineffective assistance of counsel claim was both deficient and prejudicial.  *See Martinez*, 132 S. Ct. at 1318; *Clabourne*, 745 F.3d at 377.

Next, although the first passage refers to the "procedural default of Hurles's *Ake* claim," i.e. the claim that the trial court erred by denying Hurles' pre-trial request for

neurological testing, *Hurles*, 752 F.3d at 783, it is clear that this Court is tasked with "consideration of appellate counsel's failure to raise" an *Ake* claim. *Id.* at 792; *see id.* at 784. Hurles raised the *Ake* claim in Claim 1 of his amended habeas petition, and the Court found it procedurally defaulted and barred from review. (Doc. 73 at 7.) Its default cannot be excused under *Martinez*, which applies only to defaulted claims of ineffective assistance of trial or appellate counsel.[5] *See Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126-27 (9th Cir. 2013) (denying petitioner's claim that *Martinez* permitted the resuscitation of a procedurally defaulted *Brady* claim, holding that only the Supreme Court could expand the application of *Martinez* to other areas). Therefore, contrary to Hurles' argument, (Doc. 188 at 8), at issue is Hurles' claim of ineffective assistance of appellate counsel in failing to raise the *Ake* claim, not the *Ake* claim itself.

Finally, the Ninth Circuit's discussion of whether appellate counsel's performance was deficient under *Strickland* must have been intended only to support its determination that the ineffective assistance of appellate counsel claim was "substantial" for purposes of *Martinez*, because otherwise remand would serve no meaningful purpose. Accordingly, the Court will undertake *de novo* review of Hurles' claim of ineffective assistance of appellate counsel.

### A.    Ineffective Assistance of Appellant Counsel

In assessing the viability of an *Ake* claim, appellate counsel first was faced with the fact that a motion for a brain mapping expert was not denied on its merits by the trial court. Trial counsel abandoned her request for a neurological examination by failing to file a non-*ex parte* motion as directed by the trial court. *See McKinley v. Smith*, 838 F.2d

---

[5] Because the Court finds that Hurles' claim of ineffective assistance of appellate counsel for failing to raise the *Ake* claim is defaulted and barred, the Court need not revisit its determination that the *Ake* claim itself is defaulted and barred. *See Edwards v. Carpenter*, 529 F.3d 446, 453 (9th Cir. 2000) (holding that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.").

1524, 1528 (11th Cir. 1988) (explaining that under *Ake* the defendant must show that he made a timely request to the trial court for expert assistance and that the request was improperly denied).  There is no suggestion that there was error in the trial court's ruling that the motion for a brain mapping expert was not appropriate for *ex parte* filing.  Therefore, on appeal the Arizona Supreme Court would have reviewed the *Ake* claim under a fundamental error standard.  *See State v. Gendron*, 812 P.2d 626, 627 (Ariz. 1991) (explaining that failure to raise an issue at trial waives the issue on appeal absent fundamental error).  To be fundamental, the error "must be clear, egregious, and curable only via a new trial."  *Id.* at 628.  Appellate counsel would have factored in the difficulty of proving fundamental error when deciding which claims to raise.  *See Miller*, 882 F.2d 1434.

Second, although the Supreme Court in *Ake* held that the State must, at a minimum, assure the defendant access to a competent psychiatrist, it "limited the right" to expert assistance to "the provision of one competent psychiatrist." 470 U.S. at 79.  The Ninth Circuit has acknowledged this limitation.  *See Pawlyk v. Wood*, 248 F.3d 815, 823 (9th Cir. 2001) (explaining that under *Ake* "due process guarantees a defendant access to a single, competent psychiatrist"); *cf. Vickers v. Stewart*, 144 F.3d 613, 615 (9th Cir. 1998) (noting open question as to "whether the Constitution requires a State to provide an indigent defendant access to diagnostic testing necessary to prepare an effective defense").  As the Ninth Circuit explained in *Leavitt v. Arave*, 646 F.3d 605 (9th Cir. 2011):

> By its own terms, *Ake* "limit[ed] the right [it] recognize[d]" to "provision of *one* competent psychiatrist."  *Ake*, 470 U.S. at 79 (emphasis added).  Given this unambiguous language, we've held that the defendant "lacks the right to appointment of a *second* psychiatrist," *Pawlyk v. Wood*, 248 F.3d 815, 824 (9th Cir. 2001), even where the first psychiatrist is alleged to be incompetent or reaches a diagnosis unfavorable to the defense.  We've recognized that *Ake's* "limitation to a single, independent psychiatrist is critical given that '[p]sychiatry is not . . . an exact science, and psychiatrists disagree widely and frequently . . . on the appropriate diagnosis.'" *Pawlyk*, 248 F.3d at 823 (quoting *Ake*, 470 U.S. at 80).  Accordingly, neither we, nor the Supreme Court, has ever held that a trial court violated *Ake* by

1    refusing to appoint a second, let alone third, mental health expert.

2    *Id.* at 610 (additional citations omitted).

3        Citing *Pawlyk* and *Leavitt*, the Northern District of California recently rejected a

4    petitioner's argument that "because there was insufficient funding for the two court-

5    appointed psychiatrists to conduct additional neurological or neuropsychological testing

6    to confirm their opinions that Petitioner was incompetent, the examinations that the

7    psychiatrists did conduct were not 'appropriate' under *Ake*."  *Marks v. Davis*, 112 F.

8    Supp.3d 949, 962-63 (N.D. Cal. 2015).  The district court reiterated that under *Ake* the

9    petitioner was entitled to *one* competent psychiatrist.  *Id.*  The court also noted that "the

10   Ninth Circuit has expressed doubt that a right to an 'appropriate examination' even

11   exists."  *Id.* at 963 (citing *Leavitt*, 646 F.3d at 610); *see also Allen v. Mullin*, 368 F.3d

12   1220, 1236-37 (10th Cir. 2004) (finding state trial court's refusal to appoint

13   neuropsychologist to assist petitioner charged with murder did not violate due process

14   where court had already appointed expert).

15       Here, the trial court provided Hurles with a competent psychologist, Dr. Walter,

16   who examined Hurles and testified at trial, thus vindicating Hurles' due process rights

17   under *Ake*.  *See Leavitt*, 646 F.3d at 610 ("Due process does not require a state to fund

18   every technologically conceivable test to rule out the possibility of an organic mental

19   disorder.")  Given the holding in *Ake* and its progeny, appellate counsel reasonably could

20   have determined that no legitimate *Ake* claim arose from the trial court's failure to

21   provide funding for an additional expert to conduct brain mapping procedures.

22       Finally, appellate counsel would have been aware of the limited utility of the brain

23   mapping results obtained by Dr. Duane, which showed only that Hurles suffered from a

24   "subtle and nonspecific abnormality" consistent with attention deficient disorder.

25   Although Hurles' expert at sentencing reviewed the brain mapping, he did not testify

26   about its results, and counsel did not present the abnormality as a mitigating

27   circumstance.  (*See* ROA 222, 226.)

28       Accordingly, although the Ninth Circuit found that Hurles raised a substantial

ineffective assistance of counsel claim, this Court finds based on these factors that appellate counsel's decision not to raise an *Ake* claim fell within the "exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690. Hurles has not shown that appellate counsel's failure to raise the *Ake* claim on appeal was objectively unreasonable.

Moreover, even if appellate counsel's performance was deficient, the Court finds no prejudice resulting from the failure to raise the *Ake* claim. The factors discussed above figure into the Court's analysis of prejudice, which requires an assessment of whether there was a reasonable probability relief would have been granted if appellate counsel had raised the *Ake* issue.

In assessing such a claim, the Arizona Supreme Court would have applied *Ake*'s "own terms," *Leavitt*, 646 F.3d at 610, and found that Hurles' due process rights were satisfied by the appointment of Dr. Walter as a defense expert. Under any standard of review, particularly fundamental error, there is not a reasonable probability that the Arizona Supreme Court would have found the *Ake* claim meritorious.

As noted, Dr. Duane prepared a CTM report before the sentencing hearing. He found "subtle nonspecific abnormalities in the left frontal area," which were "associated with mild processing difficulty." (Doc. 25, Ex. 1.) At sentencing, the trial court held in its special verdict:

> As to statutory mitigating circumstances, number one set out in Arizona Revised Statutes 12-703(G)(1), that is, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, was significantly impaired, but not so impaired as to constitute a defense to prosecution has not been proved and does not exist.

(Ex. H, at 15-16.) The evidence was not sufficient to satisfy even the preponderance of evidence burden with respect to the (G)(1) factor, which by definition is less burdensome than the insanity standard.

In addition, the Arizona Supreme Court on appeal conducted "a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified." *Hurles*, 914 P.2d at 1299. The court held

that the mitigation was insufficient to warrant leniency in light of the "quality of the aggravating circumstances." *Id*. at 1300.

Because the Arizona Supreme Court found that the (G)(1) mitigating factor was not proved, there is no reasonable probability that, if appellate counsel had raised the *Ake* claim, the court would have found that the lack of additional testing affected the guilt-phase verdict.  To establish an insanity defense, Hurles was required to prove by clear and convincing evidence that he suffered from a mental disease or defect such that he did not know the nature and quality of his act or did not know that what he was doing was wrong.  A.R.S. § 13-502(A).  Arizona law does not provide for a diminished capacity defense.  *See Clark v. Arizona*, 548 U.S. 735, 753 (2006) (rejecting challenge to the constitutionality of Arizona's "abbreviated" version of the *M'Naghten* standard).  Having determined, like the trial court, that the mitigating information was not sufficient to satisfy the (G)(1) factor by a preponderance of the evidence, the Arizona Supreme Court would not have found that it proved insanity by the higher standard of clear and convincing evidence.

If it had been presented with an *Ake* claim, the Arizona Supreme Court would have evaluated "the probable value of additional testing" and the "risk of erroneous deprivation" of Hurles' rights from denial of the testing.  *State v. Vickers*, 768 P.2d at 1177, 1181-82 (Ariz. 1989) (citing *Ake*, 470 U.S. at 74).  As already described, the brain scan prepared for Hurles' sentencing showed only that he suffered from a "subtle and nonspecific abnormality" consistent with attention deficient disorder and mild processing difficulties.  These bran scan results were not helpful to Hurles' insanity defense, and the denial of such testing did not deprive Hurles of his rights.  Evidence that Hurles suffered only from the "subtle and nonspecific abnormality" identified by the CTM would not have been consistent with Dr. Walter's testimony that Hurles was psychotic at the time of the crimes due to brain impairment.  Moreover, given the circumstances of the crime, including Hurles' efforts to evade capture, the evidence did not support a finding that Hurles was in a psychotic state and did not know that what he was doing was wrong.

In sum, given the weakness of the evidence of brain damage revealed by the CMT,

together with the fact that Hurles' rights were satisfied by the appointment of a competent expert, there is no reasonable probability that the Arizona Supreme Court would have reversed Hurles' conviction if appellate counsel had raised an *Ake* claim.

**B.    Evidentiary hearing**

Hurles asserts that the Ninth Circuit's opinion "*strongly* suggests" that the court ruled on the merits of the ineffective assistance appellate counsel claim.  (Doc. 188 at 9.) He argues, therefore, that this Court either should grant relief or order an evidentiary hearing on the *Ake* issue.  (*Id.* at 10.)  Respondents contend that an evidentiary hearing is not required to resolve the ineffective assistance of appellate counsel claim.  (Doc. 190 at 11-12.)  The Court agrees.

The Ninth Circuit held that "[t]he district court should afford Hurles an evidentiary hearing on this issue if one is warranted."  *Hurles*, 752 F.3d at 784.  An evidentiary hearing is not warranted here because the record is complete with respect to appellate counsel's performance.  *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (explaining that an evidentiary hearing is not necessary where claim can be resolved on state court record); *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) (finding petitioner not entitled to evidentiary hearing where ineffective assistance claim could be "resolved by reference to the state court record").  "When a claim of ineffective assistance of counsel is based on failure to raise issues on appeal, . . . it is the exceptional case that could not be resolved on an examination of the record alone."  *Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1986).

Hurles contends an evidentiary hearing is necessary to allow him "to present the evidence he was wrongly denied from presenting at trial."  (Doc. 188 at 10.)  The CTM brain mapping results are in the record, however, and Hurles has not identified any disputed facts that would be relevant to a review of appellate counsel's performance.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer.  Rule 11(a) of the Rules Governing Section 2254 Cases

provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could debate its resolution of Hurles' judicial bias claim and his ineffective assistance of appellate counsel claim.

### CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Petitioner Hurles' claim of judicial bias is **DENIED**.

**IT IS FURTHER ORDERED** that Hurles' claim of ineffective assistance of appellate counsel is **DENIED**.

**IT IS FURTHER ORDERED** granting a certificate of appealability on Hurles' judicial bias claim and his ineffective assistance of appellate counsel claim.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 19th day of May, 2016.

Douglas L. Rayes
United States District Judge